**UNITED STATES of America,
Appellee,**

v.

**Samuel DESIST, Frank Dioguardi, Jean
Claude LeFranc, Jean Nebbia and An-
thony Sutera, Appellants.**

No. 313, Docket 30849.

United States Court of Appeals
Second Circuit.

Originally Argued Jan. 19, 1967.

Remanded for Further Limited
Hearing May 29, 1967.

Decided Oct. 13, 1967.

Irving Younger, New York City, for appellant Desist.

Fred A. Jones, Jr., Miami, Fla., for appellants Dioguardi, Sutera, LeFranc and Nebbia.

David M. Markowitz, New York City, for appellant LeFranc.

Arnold C. Stream, New York City, for appellant Nebbia.

Abraham Glasser, New York City, of counsel for appellants Dioguardi, Sutera, LeFranc and Nebbia.

Otto G. Obermaier, Asst. U. S. Atty. (Robert M. Morgenthau, U. S. Atty., for the Southern District of New York, Michael W. Mitchell, William M. Tendy, John R. Bartels, Jr., John R. Wing, Asst. U. S. Attys., on the brief), for appellee.

Before MEDINA, ANDERSON and FEINBERG, Circuit Judges.

FEINBERG, Circuit Judge:

The five appellants were convicted under a one-count indictment charging them with a conspiracy to import narcotic drugs into the United States from France. 21 U.S.C. §§ 173, 174. The

case involved what is alleged to be the largest single seizure of pure heroin in the United States, valued at sums as high as $100,000,000, and totalling some 209 pounds. The trial, lasting four weeks, was in the Southern District of New York before Judge Palmieri and a jury. We affirm all five convictions for the reasons stated below.[1]

## I. The Facts

The following statement of facts is what the jury could have found, viewing the evidence in the light most favorable to the Government. Glasser v. United States, 315 U.S. 60, 80, 62 S.Ct. 457, 86 L.Ed. 680 (1942). It was presented to the jury primarily through the testimony of co-defendant Herman Conder[2] and various government agents.

Early in 1963, Conder, a United States Army Warrant Officer, met appellant Samuel Desist, a Major; Conder was then looking for accommodations for his wife and children, who were soon to join him in France. Conder rented one of Desist's apartments, and thereafter the two became friendly. In July 1965, when Conder was preparing to return to the United States, Desist offered to pay him $10,000 if Conder would ship a food freezer as part of his household goods. Desist told Conder not to tell the latter's wife because "women can't keep a secret." Conder agreed, and a used freezer was delivered to Conder, according to plan. At Desist's instruction, Conder took the freezer apart one day, left it in the storage area of his apartment, and found it completely reassembled the next day. Secreted into it were 190 plastic bags, each holding an average of a half-kilogram (1.1 pounds) of pure heroin.

In September .1965, the freezer was shipped by Conder, along with his other goods, to Fort Benning, Georgia; ten days later Conder and his family left for the United States. Once at Fort Benning, which is in the Columbus, Georgia area, Conder moved into a house trailer. The freezer arrived in the third week of November; Conder immediately communicated this fact to Desist. On December 12, Desist flew from Paris to New York and called Conder, arranging a visit at the end of the week. Thus, the initial phase of the conspiracy—importing heroin—was successfully accomplished. There remained the efforts of Desist, with two other French exporters —Jean Claude LeFranc and Jean Nebbia —to dispose of the narcotics in this country.

On December 11, appellant Nebbia had left Paris on a plane bound for New York; five days later he went, together with appellant LeFranc, to an airline ticket counter in New York where LeFranc made a through reservation for Nebbia for Columbus, Georgia. LeFranc said that a car rented in Columbus would be used for driving to Miami. The night of December 16, Desist met with Nebbia in the Waldorf-Astoria Hotel, Manhattan. Desist said he would fly to Rochester "to see the boss" and from there by way of Atlanta to Columbus, where he would pay his contact "20 bills" for the merchandise. Nebbia was reassured that the contact was well-known to Desist; Desist said everything would be ready for Nebbia so "the transfer can be made automatically." There was an inquiry about suitcases, and Desist said it would take three or four hours to make the "transfer." Desist referred to a trailer, and the "Black Angus," a motel at which Conder had made a reservation for Desist; Nebbia said he would meet Desist in Columbus and cautioned about risks. On December 17, Nebbia and LeFranc went to buy a map together. Back at the hotel room LeFranc said he would go to Columbus from Atlanta and told Nebbia to get a car; they would purchase the suitcases. A trailer was mentioned in this conversation also.

---

1. Each appellant adopts the arguments made by the others insofar as applicable. Therefore, we will identify the appellant on whose behalf a point was originally urged only when the argument is peculiarly relevant to him.

2. The charge against Conder was severed at the start of the trial.

While thus making sure of obtaining the heroin, Nebbia and LeFranc were simultaneously arranging to dispose of it. Also on December 17, appellants Frank Dioguardi and Anthony Sutera flew up to New York from Miami; in the afternoon they registered under false names at a Manhattan motel. That night LeFranc came out of a Manhattan bar and stood on the sidewalk, and Dioguardi and Sutera pulled up in a rented car and double-parked. LeFranc approached the car, had a short conversation, and entered it; the car was parked and the three went to Adano's Restaurant a few blocks away.

LeFranc told his companions he was looking forward to Atlanta, which was a cleaner place than New York, and said he would enjoy Miami; Sutera agreed with this observation and said he was also looking forward to returning to Miami. Dioguardi made a telephone call, during which he said that he was "with the man now and they were leaving for Atlanta in the morning," and that he expected to see him Monday or Tuesday the following week. Rejoining his companions, Dioguardi said everything was "o. k. * * * on my end," but there were several problems. Sutera said he and Dioguardi had not yet seen anything, and LeFranc replied that he had explained this to his friend who had assured him that "it is here already." LeFranc said that all that remained was to go down there, pick it up, and make the transfer to Dioguardi and Sutera. Dioguardi said that LeFranc's "friend" apparently didn't trust anyone; they too wanted to be careful, but at the same time wanted to know more about how the deal would come off. Sutera proposed that he and Dioguardi go to Atlanta with LeFranc to pick up the "merchandise" and save LeFranc an extra trip.

LeFranc said that was impossible; only he and his friend were to go to Atlanta and pick up the merchandise and then he would call Dioguardi and Sutera in Miami and arrange for the transfer to them. There was some more discussion about the mechanics of the transfer,

LeFranc stating at one point that "in the past people have been betrayed, and everything has been lost, even the people." During dinner Dioguardi made another telephone call during which he stated that "this was a once-a-year deal and it takes time to iron out the problems." A day later, Dioguardi and Sutera flew back to Miami.

On the same day that LeFranc was meeting with the potential buyers, Desist flew to Rochester and thence to Georgia to get the heroin. That night Conder met him at the Columbus airport; Desist registered in the Black Angus Motel, and they both went to Conder's trailer. Conder told Desist the freezer was in a box adjacent to the trailer; Desist said certain persons would arrive the following afternoon at 2:00 to pick up its contents, and that Conder should arrange to have his wife away. Once at the trailer, Conder pointed out the freezer. On the next morning, Nebbia and LeFranc boarded a plane in New York bound for Atlanta; in Atlanta they changed planes for Columbus, and Desist met them at the Columbus airport that afternoon. Nebbia rented a car, and the three drove around and stopped at a restaurant. Desist was eventually left in the Columbus shopping area.

Nebbia and LeFranc continued driving around, winding up in Opelika, Alabama, about 4:00 P.M. There they purchased two suitcases, a foot locker and a travel bag. Arriving back in Columbus, they met Desist at the Black Angus; after a short while in Desist's room, Nebbia and LeFranc resumed their driving. Eventually, they registered at a motel under a fictitious name. Repeatedly that day they drove in a way that would make it difficult to follow them unnoticed.

After Nebbia and LeFranc had left his motel room, Desist called Conder, and they met at a restaurant. Desist explained that the project would take longer than anticipated because the people who were to pick up the merchandise had returned to Atlanta to rent another car because they thought they had been

followed. The pickup would be the following day; the people would be Frenchmen. (Nebbia and LeFranc spoke to each other in French.) Desist surreptitiously handed Condor $2,000, and pointed out that Conder could buy suitcases in the morning if necessary. Conder rejected an offer of several hundred dollars or a car for taking the contents of the freezer to Atlanta.

On Sunday morning, December 19, Desist went to Conder's trailer camp and told Conder to buy the suitcases. After driving Desist back to the motel, Conder bought four large suitcases. Back at his trailer he removed all the plastic bags from the freezer and put them in the suitcases he had bought; he had to use two of his own as well. One suitcase was placed inside the trailer and five in a shed near the trailer. This was about 1:00 in the afternoon. After Desist called and checked, Conder waited for the Frenchmen, but they never arrived.

That same morning Nebbia and LeFranc had checked out of their motel, driven to Atlanta and rented another car. They met Desist in his motel room, and saw somebody as they were leaving who they thought might be watching them. Desist then called Conder and told him that the two had become suspicious and would wait several days before coming to pick up the suitcases. LeFranc and Nebbia meanwhile headed for Atlanta and returned the second car they had rented. They took a cab to where the first rented car was, and returned that car too. Early Monday morning they boarded a plane for New York. A few hours later Conder was arrested at his trailer and produced the six suitcases containing the heroin.

The foregoing was the Government's case. The version of the facts offered by appellants is, of course, radically different. Thus, the testimony of various government agents was attacked as incredible; e. g., as to the account of conversations overheard by agents at the bar in Adano's Restaurant, defendants argued that conspirators would not conduct meetings there when strangers were present because the bar was so small; Dioguardi introduced affirmative evidence that he had been in New York on the day in question on business; Desist offered an alibi for the night he had a supposed conversation with Nebbia in the Waldorf-Astoria; LeFranc attempted to show that he was in this country only for purposes connected with his membership in a secret French political organization.[3] But these are now fruitless gambits; the jury by its verdict rejected them, and we are bound by that disposition.

## II. Sufficiency of the Evidence

■ All appellants urge reversal on the ground of insufficient evidence to go to the jury or for conviction under what they term "the rule of reasonable doubt." Dioguardi and Sutera argue first that there was no proof that either of them had the requisite knowledge that the narcotics were imported. There was no claim that these appellants ever had possession of the narcotics, so that the inference in 21 U.S.C. § 174 could not aid the Government. See United States v. Goldstein, 323 F.2d 753 (2d Cir. 1963) (per curiam), cert. denied, 376 U.S. 920, 84 S.Ct. 677, 11 L.Ed.2d 615 (1964). Judge Palmieri charged the jury that as to these two defendants "you must find actual knowledge that the drugs were illegally imported from abroad"; the judge also observed that the Government rested its case as to knowledge on LeFranc's statement to Dioguardi and Sutera (in Adano's Restaurant) "it is here already," and on "other evidence." Appellants contend that there was no "other evidence," and that "here" does not necessarily refer to the United States, considered as a country, but could as rationally mean one rather than another location within the United States. However, the conversation also referred to going down and picking "it" up in Atlanta. Hence, the jury could reasonably infer that "here," in a conversation taking place in New York, did

3. Nebbia and Desist also offered character testimony.

not refer to the specific location of the narcotics in the United States, but rather to its arrival from overseas.

▮ Dioguardi and Sutera also challenge the sufficiency of evidence that they conspired to deal in narcotics. There clearly was enough evidence to allow the inference that these two appellants were conspiring with LeFranc in Adano's about something. Dioguardi and Sutera had registered in New York under assumed names; while with LeFranc, Dioguardi told someone on the telephone that this was a "once-a-year deal"; LeFranc warned of the dangers for all; Dioguardi and Sutera sought to assure the transfer of "merchandise" to them, even suggesting that they go to Atlanta to assist; and their stake in, and concern over, the success of the venture was obvious. Cf. United States v. Cianchetti, 315 F.2d 584, 588 (2d Cir. 1963). What the insufficiency argument is reduced to is that the word "narcotics" was not spoken at Adano's, so that the conspiracy could have been to transfer something else. We pause to note that those who buy and sell narcotics normally use vague euphemisms or jargon to describe their contraband. See United States v. Llanes, 357 F.2d 119 (2d Cir. 1966) ("stuff"); United States v. Ramsey, 374 F.2d 192 (2d Cir. 1967) ("good 'treys' "). The basic defect of the argument is the assumption that the jury had to base its verdict against these two appellants solely on this conversation in the abstract. But, of course, this was not so. From the evidence of acts of other defendants, "verbal" or otherwise, properly before the jury,[4] it could have taken into account that Conder shipped a freezer to Fort Benning, Georgia; Desist knew Conder; Nebbia and LeFranc came to the United States; Nebbia knew Desist; Desist flew down to Georgia to meet with Conder; Nebbia and LeFranc shortly thereafter also flew down to Atlanta and met Desist; Conder transferred heroin from the freezer to suitcases; and then Nebbia and LeFranc went back to New York. These events happened within a short time (except for the initial arrival of the freezer into the United States). While it could be by coincidence that Dioguardi and Sutera were interested in other "merchandise" in Georgia that LeFranc was to transfer to them so furtively, it was a much more persuasive inference that the "merchandise" was to their knowledge narcotics. If to this is added the evidence of "hearsay" declarations of co-conspirators, there was obviously much more than enough to go to the jury, although we do not mean to imply that the evidence was insufficient without these declarations. Judge Palmieri had already decided that the declarations could be considered by the jury and we find no error in that determination. United States v. Ross, 321 F.2d 61, 68 (2d Cir.), cert. denied, 375 U.S. 894, 84 S.Ct. 170, 11 L.Ed.2d 123 (1963). Indeed, in allowing the jury again to make a preliminary determination as to the competence of this evidence, the judge was too generous to appellants. See United States v. Stadter, 336 F.2d 326, 329–330 (2d Cir. 1964), cert. denied, 380 U.S. 945, 85 S.Ct. 1028, 13 L.Ed.2d 964 (1965); United States v. Ragland, 375 F.2d 471 (2d Cir. 1967). We hold that there was sufficient evidence to go to the jury on the role of Dioguardi and Sutera in the conspiracy. Finally, the mass of evidence against LeFranc, Nebbia and Desist does not warrant discussion as to its sufficiency.[5]

4. See Lutwak v. United States, 344 U.S. 604, 618, 73 S.Ct. 481, 97 L.Ed. 593 (1953); United States v. Nuccio, 373 F.2d 168 (2d Cir.), cert. denied, 387 U.S. 906, 87 S.Ct. 1688, 18 L.Ed.2d 623 (1967).

5. We need not enter the controversy of whether the standard of ultimate persuasion ("beyond a reasonable doubt") is incorporated, as appellants assume, into the legal test of sufficiency of evidence, because the evidence met even this standard. For discussion of the problem, see Moore's Federal Practice—Cipes, Criminal Rules ¶ 29.06 (1966); United States v. Leitner, 202 F.Supp. 688, 693–694 (S.D.N.Y.1962), aff'd per curiam, 312 F.2d 107 (2d Cir. 1963); United States v. Burgos, 328 F.2d 109, 110–111 (2d Cir. 1964).

## III. Reception into Evidence of the Narcotics

One of the most important items of evidence produced by the Government was the vast amount of heroin seized from Conder in his trailer home in Georgia. Appellants claim that it was error to admit the heroin into evidence because the warrants authorizing the seizure were defective.[6] The point was first raised by a motion to suppress in the district court, which was denied by Judge Weinfeld; it was pressed again equally unsuccessfully at trial before Judge Palmieri.

In support of warrants to search Conder's automobile and trailer and sheds, identical sworn statements by a narcotics agent were submitted to the United States Commissioner for the Middle District of Georgia. The statement is imposing in its detail.[7] It is claimed, however, that the affidavit does not affirm personal knowledge of the facts, or the source of the affiant's belief, or the reliability of that source. For example, the affidavit states that "Desist was followed to his room"; appellants ask "By whom?" Appellants rely on Aguilar v. State of Texas, 378 U.S. 108,

---

6. A question of the standing of appellants to object to the seizure has been raised, but we do not have to reach it.

7. The affidavit in support of the warrant to search the trailer and sheds stated, in relevant part, the following:

The undersigned being duly sworn deposes and says:

That he (has reason to believe) that (on the premises known as) Lot #30, in Bill Miller Trailer Park, 3318 Victory Drive, Columbus, Georgia where is located one Blue and White, in color, House Trailer residence of Herman Conder in the Columbus Division in the Middle District of Georgia, there is now being concealed certain property, namely a large quantity of Heroin which see attached affidavit which is a part of this Affidavit for Search and Seizure.

And that the facts tending to establish the foregoing grounds for issuance of a Search Warrant are as follows:

·* * * * *

1. In furtherance of a continuing investigation commenced in New York City, several weeks ago, which indicated that two individuals namely Jeanot Nebbia and Jean LeFranc, would proceed to Columbus Ga. to· receive a tremedous shipment of heroin, the following facts are set forth to support my application for two search warrants.
2. Investigation in NYC indicated that Nebbia and Le Franc would proceed to Columbus Ga. on December 18, 1965 and would there met and receive from an individual I now know to be using the name of Sam DeSist, about 100 kilograms of heroin.
3. On December 18, 1965 these two individuals did arrive in Columbus and did meet at the Airport Sam DeSist. They rented a car and drove to the

Buckineer Restaurant. After a long conversation Nebbia and Le Franc were followed to Opelika Alabama, where there were seen to purchase 3 bule suitcases and a large foot locker.
4. They then returned to Columbus and again met with Sam DeSist at the Black Angus Restaurant. After a conversation, Nebbia and LeFranc departed and speeded back toward Atlanta, Ga. Desist was followed to his room at 108 Black Angus Motel. Shortly thereafter he was seen to meet and converse with one HERMAN CONDOR. He was heard to tell Condor that they had run into difficulties.
5. Condor then dropped DeSist off at his motel. The following morning De Sist was followed from his Motel to the restarurant. After breakfast he depart via taxi cab. He exited the cab and then walked some 500 yards to the Bill Miller Trailer Park. He emerged from there in the Volkswagon driven by the aforementioned Condor. They were followed to the Gaylord Shopping Center. At this location they had aconversation. De Sist was heard to tell Condor to "get the merchandise ready to move".
6. Condor then again drove DeSist to his motel and then he returned to the Gaylord Store and purchased four red suitcases. He then immediately proceeded to his trailer at the aforementioned trailer park. He took the four suitcases either into the trailer or into the two sheds immediately next to it.
7. I would like search warrants for his vehicle and the trailer and its two sheds.

[signature]
Francis E. Waters
Narcotic Agent
[Typographical errors in original.]

84 S.Ct. 1509, 12 L.Ed.2d 723 (1964), and United States v. Ventresca, 380 U.S. 102, 85 S.Ct. 741, 13 L.Ed.2d 684 (1965).

*Aguilar* involved an affidavit which merely stated that "Affiants have received reliable information from a credible person and do believe that heroin * * * [is] being kept at the above described premises for the purpose of sale and use contrary to the provisions of the law." The Court noted that "[i]f the facts and results of * * * a surveillance [on petitioner's house] had been appropriately presented to the magistrate, this would, of course, present an entirely different case." 378 U.S. at 109 n. 1, 84 S.Ct. at 1511. After discussing other similar cases where the affidavit merely stated that the affiant "has cause to suspect and does believe" certain merchandise was in a specified location,[8] or where the affidavit said simply that the suspect "did receive, conceal, etc., narcotic drugs * * * with knowledge of unlawful importation,"[9] the Court stated (378 U.S. at 113–115, 84 S.Ct. at 1513):

> Here the "mere conclusion" that petitioner possessed narcotics was not even that of the affiant himself; it was that of an unidentified informant. The affidavit here not only "contains no affirmative allegation that the affiant spoke with personal knowledge of the matters contained therein," it does not even contain an "affirmative allegation" that the affiant's unidentified source "spoke with personal knowledge." For all that appears, the source here merely suspected, believed or concluded that there were narcotics in petitioner's possession. The magistrate here certainly could not "judge for himself the persuasiveness of the facts relied on * * * to show probable cause." He necessarily accepted "without question" the informant's "suspicion," "belief" or "mere conclusion."

■ Although an affidavit may be based on hearsay information and need not reflect the direct personal observations of the affiant, Jones v. United States, 362 U.S. 257, [80 S.Ct. 725, 4 L.Ed.2d 697] the magistrate must be informed of some of the underlying circumstances from which the informant concluded that the narcotics were where he claimed they were, and some of the underlying circumstances from which the officer concluded that the informant, whose identity need not be disclosed, see Rugendorf v. United States, 376 U.S. 528, [84 S.Ct. 825, 11 L.Ed.2d 887], was "credible" or his information "reliable." Otherwise, "the inferences from the facts which lead to the complaint" will be drawn not "by a neutral and detached magistrate," as the Constitution requires, but instead, by a police officer "engaged in the often competitive enterprise of ferreting out crime," Giordenello v. United States, supra [357 U.S.] at 486 [78 S.Ct. at 1250]; Johnson v. United States, supra, [333 U.S.] at 14 [68 S.Ct. 367, at 369, 92 L.Ed. 436], or, as in this case, by an unidentified informant. [Footnotes omitted.]

■ In the present case, there was more than a "mere conclusion"; the affidavit could only be reasonably read to mean that the signer conducted at least some of the investigation or spoke to those who had investigated and watched; the facts alleged show more than the affiant's mere suspicion, belief, or conclusion as to the location of the heroin; the magistrate could judge for himself the persuasiveness of the fruit of the investigation; there is no question of credibility of an "informant," since the affidavit obviously is chiefly derived either from the affiant's knowledge or that of fellow agents. The language in *Aguilar* about informants must be read in conjunction with the affidavit under scrutiny in that case. Thus, in United States v. Ventresca, supra, where the affiant had received his information from other investigators, the Court found "reason for

---

8. Nathanson v. United States, 290 U.S. 41, 54 S.Ct. 11, 78 L.Ed. 159 (1933).

9. Giordenello v. United States, 357 U.S. 480, 78 S.Ct. 1245, 2 L.Ed.2d 1503 (1958).

crediting the source of the information" because "[o]bservations of fellow officers of the Government engaged in a common investigation are plainly a reliable basis for a warrant applied for by one of their number." 380 U.S. at 109, 111, 85 S.Ct. at 747 (footnotes omitted).

The Supreme Court has frequently emphasized that it is desirable for officers to obtain search warrants so that an independent magistrate may impartially judge whether probable cause exists, and for that reason has suggested that warrants will be examined less rigorously than searches without a warrant. E. g., United States v. Ventresca, 380 U.S. at 106–107, 85 S.Ct. at 744–745; McCray v. State of Illinois, 386 U.S. 300, 315, 87 S.Ct. 1056, 18 L.Ed.2d 62 (1967) (dissenting opinion).[10] When a narcotics agent has done just what the Court encourages, reading a warrant as though it were a trust indenture can only discourage adherence to that policy. If the affidavit here is "read in a commonsense way rather than technically," 380 U.S. at 109, 85 S.Ct. at 1511, it was clearly sufficient. We hold that the warrants were properly issued and the heroin was admissible at trial.

## IV. Admissibility of Evidence Obtained Through Electronic Eavesdropping

▇ Another evidence problem concerns conversations between Nebbia and Desist in the Waldorf-Astoria Hotel on the night of December 16, and between Nebbia and LeFranc on December 17. Evidence of these came mainly from testimony of a government agent who eavesdropped, and from contemporaneous tape recordings.[11]

Early in the pre-trial proceedings, the Government commendably informed both the court and defense counsel that an electronic listening device had been used in investigating the case, and suggested a hearing be held as to its legality. Thereafter, Judge Palmieri conducted a three-day hearing during which seven law enforcement agents and a Waldorf-Astoria Hotel employee testified; the hearing even included an actual reconstruction in the hotel room of the equipment that had been used. From the evidence adduced, the eavesdropping occurred as follows: A few days after Nebbia had checked into the Waldorf-Astoria, two agents asked a hotel official in what room Nebbia was registered, and were given the adjoining room, Room 1600. Inspection of the agents' room disclosed that a door opened on to a "very small" air space, on the other side of which was a similar door opening into Room 1602, Nebbia's room. This door to Nebbia's room was never opened, nor was anything attached to it. The agents placed a microphone against the door inside of Room 1600, with its face turned toward a ⅜ inch space between the bottom of the door and the door sill. Nothing was placed under the door, nor was the microphone inserted into the space at the bottom of the door. The microphone was wired to an amplifier and tape recorder; the agents monitored conversations taking place in Room 1602.

Defendants advance a number of reasons why it was error to admit evidence of the two overheard conversations. First they argue that the eavesdropping was "trespassory" in effect and therefore impermissible under Supreme Court decisions, citing Clinton v. Virginia, 377 U.S. 158, 84 S.Ct. 1186, 12 L.Ed.2d 213 (1964), reversing per curiam 204 Va. 275, 130 S.E.2d 437 (1963), and Silverman v. United States, 365 U.S. 505, 81 S.Ct. 679, 5 L.Ed.2d 734 (1961). This was the contention made below, but Judge Palmieri found to the contrary. After the thorough evidentiary hearing, the judge concluded that "'nothing has been adduced to indicate there was a physical trespass or any basis upon which the evidence should be suppressed. * * * [T]here was no illegality to the procedures followed by the agents and I therefore deny the motion [to sup-

---

10. The dissenters in *McCray*, even though voting to reverse the conviction, explicitly recognized the principle.

11. Once again a question of standing is raised—at least as to Dioguardi and Sutera—but it is not necessary to reach it.

press]." Appellants recognize that this court's recent decision in United States v. Pardo-Bolland, 2 Cir., 348 F.2d 316, cert. denied, 382 U.S. 944, 946, 86 S.Ct. 388, 15 L.Ed.2d 353 (1965), presents a formidable obstacle to them. In that case, similar electronic eavesdropping in a hotel room was held constitutional. Ascribing controlling effect—as the Supreme Court has done—to the existence of a "physical intrusion" [12] in assessing the legality of electronic eavesdropping has been the subject of considerable discussion. See, e. g., Westin, Science, Privacy, and Freedom: Issues and Proposals for the 1970's, 66 Colum.L.Rev. 1205, 1232–53 (1966); The Supreme Court, 1960 Term, 75 Harv.L.Rev. 80, 184–87 (1961); President's Commission on Law Enforcement and Administration of Justice, The Challenge of Crime in a Free Society 201–03 (1967). Appellants argue that Berger v. State of New York, 388 U.S. 41, 87 S.Ct. 1873, 18 L.Ed.2d 1040 (1967), contains language that supports the view that the type of nontrespassory eavesdropping present here is improper. However, the holding of that case is that a search that would otherwise be unconstitutional because of a physical intrusion was not cured by a court order under a statute which did not require sufficient safeguards. We are aware that these issues may again be examined closely by the Supreme Court in the near future. Katz v. United States, 386 U.S. 954, 87 S.Ct. 1021, 18 L.Ed.2d 102 (1967) (granting certiorari; questions presented). However, we are bound by Pardo-Bolland and the cases upon which it relied; [13] appellants must distinguish them to prevail here.

Some appellants accept the challenge and point out that the standard of unconstitutional eavesdropping is not just technical "trespass," but "an actual intrusion into a constitutionally protected area." Silverman v. United States, 365 U.S. at 512, 81 S.Ct. at 683. Therefore, they ask us to distinguish Pardo-Bolland on its facts. Thus, much is made of use by the agents here of the air-space between the two doors of Rooms 1600 and 1602, while in Pardo-Bolland there was only a single door, and in Goldman v. United States, 316 U.S. 129, 62 S.Ct. 993, 86 L.Ed. 1322 (1942), only a common wall to which the listening device was attached. Appellants emphasize that the purpose of the air-space between the two rooms was to enhance privacy; this may be so, but a single door or wall also is intended to enhance privacy. That the air-space may have improved the possibilities for eavesdropping under expanding technology—as appellants claim and we will assume arguendo [14]—is not constitutionally significant under Supreme Court case law.

Appellants also claim that the hotel improperly cooperated with the agents, a feature possibly present in Pardo-Bolland [15] but apparently not considered material there by the parties or the court. However, the testimony of Agent Schrier, which Judge Palmieri was free to accept, disposed of any contention that the hotel's management surreptitiously placed Nebbia in a particular room or kept an adjacent room available for the agents.[16] We agree that the statement in Hoffa v. United States, 385 U.S. 293, 302, 87 S.Ct. 408, 17 L.Ed.2d 374 (1966), referring to reliance on "the security of" a hotel suite, is suggestive but in the

---

12. Silverman v. United States, 365 U.S. 505, 509, 81 S.Ct. 679 (1961).

13. With admirable candor, appellant Desist's original brief concedes that it is "futile to argue here what has been foreclosed" by the Supreme Court, and admits that much of its argument is to preserve questions for possible Supreme Court review.

14. Appellants argue that the narrow air-space between the double doors separat-

ing the two rooms made the electronic installation a "parabolic mike" which invaded Room 1602's "acoustical barrier."

15. Appellant's Appendix at 22a–23a, United States v. Pardo-Bolland, 348 F.2d 316 (2d Cir. 1965).

16. Although appellants were originally foreclosed from this line of inquiry, the matter was eventually aired at the preliminary hearing before Judge Palmieri.

context of the controlling cases the limited cooperation of the innkeeper here hardly seems dispositive. The final effort to distinguish *Pardo-Bolland* is the claim of actual trespass by one of the agents, who testified that he placed his ear against the door opening into Nebbia's room for a "matter of seconds" and heard nothing. One must strain to call this a "trespass" in the relevant sense; in any event, it led to nothing. Cf. Goldman v. United States, 316 U.S. at 134–135, 62 S.Ct. at 995–996. Based upon the controlling precedents, which we find indistinguishable, we hold that there was here no "actual intrusion into a constitutionally protected area."

■ Apart from the variety of assaults on *Pardo-Bolland*, appellants offer additional arguments relating to the overheard conversations. Thus, they object to the use at trial of the contemporaneous tape recordings of the conversations. During the trial, there was an extensive two-day voir dire hearing, during which the tapes were played for the court and defense counsel, copies of transcripts of the tapes prepared by Agent Kiere were provided, and defense counsel were allowed to make their own copies of the recordings. At the end of the hearing, Judge Palmieri overruled all objections. Before the jury, Kiere first testified to the portions of the conversations he recalled overhearing, and then the tapes were played with Kiere translating as the tape went along. The conversations were in French; appellants requested the trial court to appoint an impartial interpreter, who would make a simultaneous translation for the jury. The trial judge, who was fluent in French, as were Kiere and one or two colleagues of defense counsel, suggested a conference to arrive at an agreed-upon translation. The defendants rejected this procedure, and Kiere acted as translator for what he had heard. Appellants claim that an impartial interpreter would have buttressed their conclusion that the tapes were unintelligible; under the admitted fact that the agent spent seventy-five hours on his own to translate the forty-five minute tape, an impartial translator, they say, became essential for a fair trial. However, appellants were given ample opportunity to cross-examine the agent or bring in their own translator to rebut him.[17] Under the adversary system, the Government was allowed to use its agent as an expert witness, and the "unfairness" appellants allege is illusory. We have carefully considered this and other contentions; we hold that Judge Palmieri commited no error in connection with the tapes.

Another attack on the overheard conversations stems from recent admissions by the Solicitor General in the Supreme Court of trespassory eavesdropping; e. g., in Black v. United States, 385 U.S. 26, 87 S.Ct. 190, 17 L.Ed.2d 26 (1966) (per curiam), and Schipani v. United States, 385 U.S. 372, 87 S.Ct. 533, 17 L.Ed.2d 428 (1966) (per curiam).[18] Appellants claim that memoranda of the Solicitor General in these cases make clear that President Johnson issued a policy statement on June 30, 1965, under which all electronic eavesdropping—trespassory or not—is prohibited without prior authorization of the Attorney General, apparently not obtained here. Appellants also suggest, *inter alia*, that:

> [I]t would be proper for this Court to request the Attorney General (or the Acting Attorney General), or the Chief Justice of the Supreme Court, to inquire of the White House (and if necessary of the President himself) as to what the President said on the occasion in question.

The Government responds that the President's policy merely emphasized to all

17. Cf. United States v. Gibert, 25 F.Cas. pp. 1287, 1312 (No. 15,204) (C.C.D.Mass. 1834) (Story, J.).

18. See Supplemental Memorandum for the United States, Black v. United States, 385 U.S. 26, 87 S.Ct. 190 (1966) (microphone penetrated moving of petitioner's suite); Supplemental Memorandum for the United States, Schipani v. United States, 385 U.S. 372, 87 S.Ct. 533 (1966) (microphone installed by means of a trespass at place of business where petitioner and others frequently met).

federal agencies that any electronic surveillance was to be in full compliance with the legal standards established by the courts, which regarded the fact of trespass as crucial. This argument is supported by the fact that the same Solicitor General, upon whose memoranda appellants rely, filed another memorandum in the Supreme Court in October 1966—over a year after the claimed statement of policy—in opposition to an application for bail, which defended the validity of the eavesdropping in this very case and emphasized that there had been no trespass.[19] Similarly, according to one of the memoranda of the Solicitor General cited by appellants,[20] a memorandum of the then Acting Attorney General of November 3, 1966, addressed to all United States Attorneys, summarized the policy of the Department of Justice "in conformity with the policy declared by the President" as not proceeding with any investigation or case "which includes evidence illegally obtained or the fruits of that evidence."[21] The presidential policy statement is not in the record before us, and we do not feel that the unusual procedure appellants suggest is appropriate or that it is incumbent on the court to attempt to devise some procedure to obtain it, particularly in view of the Acting Attorney General's statement. Therefore, we will not consider further the legal effect, if any, on the courts of an internal administrative statement.

Appellants also sought a direction from this court that the Solicitor General conduct in this case a review similar to those already had in *Schipani* and *Black* to discover whether there was use of "evidence obtained in violation of a defendant's protected rights."[22] Such a review was made and on April 27, 1967 we were advised by the United States Attorney that, in addition to the monitoring at the Waldorf, there were two other instances of electronic monitoring; both involved a trespass. By orders entered in May and June 1967, we thereafter remanded the case to the district court so that the trial judge could conduct a prompt and full hearing into these and any other electronic eavesdrops of any kind which related to this case (except for the Waldorf monitoring which had already been fully litigated). After a number of pre-trial conferences, Judge Palmieri held such a hearing. Fourteen witnesses testified on four separate days; various records of the Federal Bureau of Investigation were provided, and the record consumed over 800 pages of transcript.

In a thorough 37-page opinion, the judge found, *inter alia*, as follows: There was use in 1962–1963 of an electronic listening device installed by trespass in a business establishment in Miami, Florida by which conversations of defendant Dioguardi were heard. However, the investigation and conversations were totally unrelated to the evidence in this case, whose principal events occurred over two years later. There was another incident involving these defendants in December 1965 in Columbus, Georgia when a listening apparatus was installed by narcotics agents in a car rented to defendant Nebbia by Avis. However, the apparatus did not function and noth-

19. Memorandum for the United States in Opposition (dated October, 1966), Dioguardi v. United States (Sup.Ct., Oct. Term 1966).

20. Supplemental Memorandum for the United States at 4–5 n. 3, Schipani v. United States, 385 U.S. 372, 87 S.Ct. 533 (1966).

21. We note also that the United States Attorney for the Southern District of New York, in a Supplemental Memorandum dated February 1, 1967, filed in this court, flatly takes the position that the "policy declaration" was such a "reaffirmation" of existing law. That the United States Attorney speaks for the Attorney General in these matters in this court is evidenced by the Memorandum, filed by him February 10, 1967, in United States v. Borgese, 372 F.2d 950 (2d Cir. 1967) (per curiam), admitting that evidence collected by illegal wire tapping was used at the trial in that case and suggesting a new trial.

22. Supplemental Memorandum for the United States at 5, Schipani v. United States.

ing coherent was obtained. Finally, the judge considered and rejected a claim made by defendants that at the Black Angus Motel in Columbus, Georgia federal agents had obtained evidence by other illegal activities. In sum, Judge Palmieri concluded that no showing was made "that any of the evidence used against them [defendants] at the trial was tainted by any invasion of their constitutional rights." Defendants attack the judge's findings of fact and conclusions of law on various grounds. We have considered them all and do not find them persuasive.

Finally, appellants also move for an order granting permission for an electronic consultant, hired after the trial below was completed, to inspect and listen to the tape recordings used at trial. The principal ground advanced for the motion is that the consultant might somehow be able to demonstrate that the tapes were a product of trespass. However, the suggestion of trespass was adequately explored by the trial court, and we see no basis for allowing the issue to be relitigated because defense counsel, as they concede, "simply 'missed' several meanings of the agents' testimony" before Judge Palmieri which they now "perceive." Accordingly, we hold that the evidence at trial of conversations at the Waldorf-Astoria was admissible.

## V.   Refusal to Appoint an Interpreter

■ Appellant Nebbia contends that he was denied due process and a fair trial, as well as the rights of confrontation, presence at his trial, and effective assistance of counsel, by the trial judge's refusal to provide him at government expense with a court-appointed interpreter to render simultaneous translation of the proceedings.[23] It is not seriously disputed that Nebbia understands French but does not understand English well, if at all. He first asked for a translator without expense to himself during a pre-trial conference; the request was specifically not based on indigency—a position consonant with Nebbia's ability to post $100,000 within a few hours at an earlier stage of the proceeding, see United States v. Nebbia, 357 F.2d 303 (2d Cir. 1966). The question Nebbia poses, therefore, is whether a defendant has an absolute right to a free simultaneous translator.[24]

There is surprisingly little discussion of the issue in the cases. The Supreme Court has not ruled on the question, cf. Felts v. Murphy, 201 U.S. 123, 26 S.Ct. 366, 50 L.Ed. 689 (1906), although it has held that appointment of an interpreter when the defendant was testifying was discretionary with the trial judge, Perovich v. United States, 205 U.S. 86, 91, 27 S.Ct. 456, 51 L.Ed. 722 (1907). However, the discretion appeared related to evaluation of the defendant's ability to understand the interrogation and express himself in English. This court has apparently ruled on interpreters in criminal cases only rarely[25] and not on the point here involved. The cases in this circuit and elsewhere have dealt in the main with the competence of the particular interpreter used[26] or whether there really was a language barrier,[27] particularly if, as in Perovich v. United States, supra, the defendant testified and the problem was whether he could adequately convey

---

23. The other appellants contend that they were also prejudiced, but that claim is not impressive.

24. See also Ex Parte Roelker, 20 F.Cas. p. 1092 (No. 11,995) (D.Mass.1854).

25. United States v. Guerra, 334 F.2d 138, 142–143 (2d Cir.), cert. denied, 379 U.S. 936, 85 S.Ct. 337, 13 L.Ed.2d 346 (1964); United States v. Paroutian, 299 F.2d 486, 490 (2d Cir. 1962); cf. Barber Asphalt Pav. Co. v. Odasz, 85 F. 754, 756 (2d Cir. 1898).

26. E.g., Thiede v. People of Territory of Utah, 159 U.S. 510, 519–520, 16 S.Ct. 62, 40 L.Ed. 237 (1895) (use of juror as interpreter held not prejudicial); United States v. Guerra, supra note 25; Lujan v. United States, 209 F.2d 190, 192 (10th Cir. 1953); United States v. Gonzalez, 33 F.R.D. 276, 279 (S.D.N.Y.1958).

27. Pietrzak v. United States, 188 F.2d 418, 420 (5th Cir.), cert. denied, 342 U. S. 824, 72 S.Ct. 44, 96 L.Ed. 623 (1951).

his thoughts to the jury.[28] That issue differs somewhat from the right to have a personal interpreter give a simultaneous translation of what is being said in the courtroom.[29] In Tapia-Corona v. United States, 369 F.2d 366 (9th Cir. 1966) (per curiam), the court held that a Spanish-speaking defendant was not entitled to "have all English testimony * * * instantly interpreted to him" in view of the fact that "[t]he official Spanish interpreter sat at the defense counsel table and was available for immediate consultation." However, to the extent that the case impliedly recognizes at least a right to an "official" interpreter, it is helpful to Nebbia; but it is not clear from the opinion in that case whether appellant was indigent. See also Chavira Gonzales v. United States, 314 F.2d 750, 752 (9th Cir. 1963).

A number of serious weaknesses in Nebbia's legal position emerge from the record. Thus, facilities available to him during the proceedings below included a French-speaking partner in the law firm retained by him and its employees or contacts.[30] Moreover, even though trial counsel was not fluent in French, Judge Palmieri stated, after the trial, that from his own observation he had no doubt that Nebbia had been sufficiently in communication with trial counsel to permit the latter "to conduct a vigorous and able defense in [Nebbia's] behalf."[31] In addition, in the posture the issue comes before us, we must assume—and it is a reasonable assumption—that Nebbia was quite able to afford an interpreter and to find a qualified one. Under these circumstances, if the real point is guarantee of a fair trial, it is a little difficult to see why Nebbia is not required to lie in the bed that he made. We are aware that trying a defendant in a language he does not understand has a Kafka-like quality, but Nebbia's ability to remedy that situation dissipates substantially— perhaps completely—any feeling of unease. In other words, if Nebbia denied himself the interpreter and stands on his right to do so, does not the issue become solely who should have paid for one?[32] Moreover, we doubt that Nebbia's claimed absolute constitutional right to an interpreter is stronger than the absolute right to a court-appointed counsel; the latter is held only by the indigent, Gideon v. Wainwright, 372 U.S. 335, 339–340, 83 S.Ct. 792, 9 L.Ed.2d 799 (1963); United States v. Arlen, 252 F.2d 491, 495 (2d Cir. 1958). See also Cervantes v. Cox, 350 F.2d 855 (10th Cir. 1965).[33] From Nebbia's point of view, we think the most persuasive approach is the point made at oral argument that if the Government chooses to prosecute someone, the burden rests upon it to furnish the

---

28. Suarez v. United States, 309 F.2d 709, 712 (5th Cir. 1962); cf. Kane v. American Tankers Corp., 219 F.2d 637, 641 (2d Cir. 1955).

29. See Gonzalez v. People of Virgin Islands, 109 F.2d 215, 217 (3d Cir. 1940) (assuming *arguendo* constitutional right, but finding no inability to understand English).

30. The French Embassy originally asked the firm to represent Nebbia.

31. Although Judge Palmieri accepted counsel's representation that he was not conversant in French, the record clearly shows that the judge believed the defense was not hindered by a communication barrier.

32. At one point in the pre-trial hearings on eavesdropping, the Government provided an interpreter whose services were used for an entire day. At the beginning of the next day, Nebbia's counsel stated "I want to be certain that this is not going to be an expense incurred by the defendant"; when told that defendant would have to pay, counsel "disassociated" himself from the interpreter.

Indeed, the suggestion made here—but apparently not in the trial court—is that the trial judge should have appointed an interpreter and required Nebbia and the Government to abide the outcome of the case to determine who would pay for the interpreter's service. Cf. 28 U.S.C. § 1918(b).

33. The Criminal Justice Act of 1964, 18 U.S.C. § 3006A(e), provides that payment for services "necessary to an adequate defense" shall be directed by the court out of appropriated Treasury funds, upon a finding "that the defendant is financially unable to obtain them".

basic apparatus for intelligible and minimally comfortable proceedings, e. g., the physical accoutrements of a trial, such as a stenographer or even the courtroom itself, neither of which is billed to the defendant. Indeed, a full-time interpreter is now provided by the Government in the District Court of Puerto Rico at apparently no expense to any defendant who needs one.[34] This undoubtedly reflects a judgment that the need for an interpreter in that district is so great that sound administrative principles require that one be available at all times. However, to elevate this resolution of a local problem to the status of a constitutional requirement for all districts and all defendants and all languages is another matter.

Appellants also rely on Fed.R.Crim.P. 28(b), which provides:

> *Interpreters.* The court may appoint an interpreter of its own selection and may fix the reasonable compensation of such interpreter. Such compensation shall be paid out of funds provided by law or by the government, as the court may direct.

The rule was approved by the Supreme Court on February 28, 1966, and was reported to Congress on the same day. 383 U.S. 1088–1089. The Court's order provided that the rule "shall take effect on July 1, 1966, and shall govern all criminal proceedings thereafter commenced and so far as just and practicable all proceedings then pending." Id. at 1089. By July 1, the trial was well under way, and for all that appears in the record the rule was first mentioned on July 7, when the trial judge and appellants' counsel stipulated that appointment of an interpreter at that point—as the judge offered—could not cure any error which

might have been committed earlier. We agree, of course, with the stipulation. The Government urges that the rule could not have been used by Judge Palmieri because it only applies to indigents,[35] and, in any event, did not go into effect until over two weeks after the trial started. Although we note as to the former argument that the rule is not so limited by its text, and as to the latter that another recent rule amendment has been applied retroactively,[36] we need not deal with these questions. Assuming *arguendo* that the court had the power to appoint an interpreter, the question was still one of discretion. Although the judge did have grave doubts as to his power, we note that among the factors also influencing him were Nebbia's ability to get and pay for an interpreter of his own choice, the availability of French-speaking partners of his trial counsel, and Nebbia's ability to communicate with defense counsel. It is true that Judge Palmieri did offer to appoint an interpreter after the concededly effective date of the Rule. However, whether he would have done the same thing before the trial started, weeks before that effective date, if the Rule had been raised by defendants is another matter. We are not convinced that he would have, and, in any event, would not consider failure to do so under these circumstances an abuse of discretion.

We have considered the question carefully; taking all of the factors mentioned above into account, we hold that the failure to appoint a simultaneous interpreter at the Government's expense was not reversible error.

### VI. Miscellaneous

▆ Appellants' remaining contentions do not require extensive comment.

---

34. 1966 Jud.Conf.Rep. 59.

35. For this interpretation, the Government relies on part of the note of the Advisory Committee:

General language is used to give discretion to the court to appoint interpreters in all appropriate situations. Interpreters may be needed to interpret the testimony of non-English speaking witnesses or to assist non-English speaking defendants in understanding the proceedings or in communication with *assigned* counsel. [Emphasis added.]

36. Cascade Natural Gas Corp. v. El Paso Natural Gas Co., 386 U.S. 129, 87 S.Ct. 932, 17 L.Ed.2d 814 (1967).

Appellants complain of allegedly improper publicity; shortly after commencement of the trial, an article appeared in a New York City newspaper describing Dioguardi as follows: "Frank Diaguardi [sic] 42, identified by the Government as an underworld figure here." The defendants requested a hearing to determine if the Government had supplied the information attributed to it. Judge Palmieri inquired of the two prosecuting attorneys, who denied giving the information; decision on the motion for a hearing was reserved. The judge later satisfied himself that no juror had read the article.[37] However, appellants claim that a hearing should have been held on whether the Government had, in fact, "leaked" the information. Citing Sheppard v. Maxwell, 384 U.S. 333, 86 S.Ct. 1507, 16 L.Ed.2d 600 (1966), they argue that a prophylactic rule is called for, turning not on prejudice to a defendant, but upon "the honor of the sovereign." But cf. Chapman v. State of California, 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967). We are most aware of the Supreme Court admonition in *Sheppard* that (384 U.S. at 363, 86 S.Ct. at 1522):

> The courts must take such steps by rule and regulation that will protect their processes from prejudicial outside interferences. Neither prosecutors, counsel for defense, the accused, witnesses, court staff nor enforcement officers coming under the jurisdiction of the court should be permitted to frustrate its function.

However, since prejudice was neither demonstrated here nor probable—and is indeed not even claimed[38]—we do not read *Sheppard* as requiring that the convictions be vacated. United States v. Armone, 363 F.2d 385, 393–396 (2d Cir.), cert. denied, 385 U.S. 957, 87 S.Ct. 398, 17 L.Ed.2d 305 (1966); United States v. Bowe, 360 F.2d 1, 12 n. 9 (2d Cir.

1966), cert. denied, 385 U.S. 961, 87 S.Ct. 401, 17 L.Ed.2d 306 (1966). However, we do not think that "identification" by a government employee of a defendant in the midst of a criminal trial as "an underworld figure" is an incident to be taken lightly, if it occurred.[39] Therefore, in future similar situations, we would regard as desirable the holding of a hearing by the district court at a convenient time to find out who, if anyone, spoke for the "Government," so that proper measures could be considered, e. g., transmittal of the hearing transcript to the appropriate bar association or to the employee's supervisor. We, of course, do not suggest that the two attorneys directly asked by the trial judge furnished the information, in view of their denials in open court.

■ Finally, objection is made to the manner in which Judge Palmieri handled a communication from the jury. During its deliberations, the jury sent in the following note:

> We would like Agent Gruden's and Agent Smith's testimony as to what was overheard at the bar at Adano's restaurant.

These agents had testified to the crucial conversation discussed above between Dioguardi, Sutera and LeFranc in Adano's Restaurant on the night of December 17. Thereafter, the judge had a good portion of the agents' testimony read to the jury. However, he refused appellants' request that there also be read the bulk of the cross-examination of the agents, principally dealing with their ability to hear what they said they heard. The judge ruled that this was not the agents' "testimony as to what was overheard." Interpretation of the note was clearly a matter of discretion; while it could have been read more broadly, the trial judge's construction was not

---

37. Appellants do not claim to the contrary.

38. We note but need not consider that the newspaper reference complained of was only to Dioguardi, but the point is pressed also by Desist.

39. Cf. Special Committee on Radio, Television & the Administration of Justice (Judge Harold R. Medina, Chairman), Ass'n of the Bar of the City of New York, Freedom of the Press and Fair Trial, Final Report with Recommendations 14–26 (1967).

unreasonable. Under these circumstances, we find no error in his ruling.

We have considered the other contentions made by appellants in this court and find them without merit. The judgments are affirmed and all motions not already disposed of are denied.