**UNITED STATES of America, Appellant,**

v.

**Steve KARATHANOS and John Karathanos, Appellees.**

**No. 550, Docket 75–1322.**

United States Court of Appeals, Second Circuit.

Argued Dec. 16, 1975.

Decided Feb. 2, 1976.

Certiorari Denied July 6, 1976.

See 96 S.Ct. 3221.

**28**

Edward R. Korman, Chief Asst. U. S. Atty. (David G. Trager, U. S. Atty. for the Eastern District of New York, Brooklyn, N. Y., of counsel), for appellant.

Stanley H. Wallenstein, New York City (Schiano & Wallenstein, New York City, of counsel), for appellees.

Before MANSFIELD, OAKES and VAN GRAAFEILAND, Circuit Judges.

1. Title 8 U.S.C. § 1325 reads as follows:
   "§ 1325. *Entry of alien at improper time or place; misrepresentation and concealment of facts*
   "Any alien who (1) enters the United States at any time or place other than as designated by immigration officers, or (2) eludes examination or inspection by immigration officers, or (3) obtains entry to the

MANSFIELD, Circuit Judge:

On this appeal from a decision of the United States District Court for the Eastern District of New York ordering the suppression of certain evidence and testimony as obtained in violation of appellees' Fourth Amendment rights, the government asks us to reverse a decision by Judge James L. Watson that there was no probable cause to issue the search warrant in question or, alternatively, to restrict the operation of the exclusionary rule in this case. Since we find that the warrant was improperly issued, and are unpersuaded by the government's arguments regarding the exclusionary rule, we affirm the decision below.

The case involves a search of Steve's Pier One Restaurant in Bayville, N.Y.; appellee Steve Karathanos is the president and sole shareholder of the corporation which owns the restaurant, while appellee John Karathanos, his brother, works there as a chef. The search was conducted under authority of a search warrant issued by a United States Magistrate after Neil Jacobs, an investigator for the Immigration and Naturalization Service ("INS") swore in an affidavit that he had reason to believe illegal aliens were on the restaurant's premises. The affidavit reads, in pertinent part, as follows:

"Upon information and belief, there are a number of aliens who are not lawfully entitled to enter or reside within the United States, employed at and present within the premises known and operated as STEVE'S PIER I RESTAURANT, 33 BAYVILLE AVENUE, BAYVILLE, NEW YORK, within the Eastern District of New York. The presence of said aliens is a violation of Title 8, United States Code, Section 1325.[1] Moreover, such aliens are subject to arrest pursuant

United States by a willfully false or misleading representation or the willful concealment of a material fact, shall, for the first commission of any such offenses, be guilty of a misdemeanor and upon conviction thereof be punished by imprisonment for not more than six months, or by a fine of not more than $500, or by both, and for a subsequent commission of any such offenses shall be guilty

to Title 8, United State Code, Section 1325, for having unlawfully entered the United States.

"The source of your deponent's information and the grounds for his belief are:

"1. During the past five years at least eleven illegal aliens have been apprehended on the premises known as STEVE'S PIER I RESTAURANT, 33 BAYVILLE AVENUE, BAYVILLE, NEW YORK, including but not limited to the following individuals: MICHAEL KATSIGIORGIS, DIMITRIOUS STROUPAS, EMANUEL ARETINES, VELIRIS KOSTAS, VICTOR LLANOS, KOASTANTINOS VOULGARIDIS, ROBERTO BARRENCHEA–CAMACHO, VICTOR ALEXANDRO LLANOS–ATUNEA, LADIGLAO VENEGAS–FLORES, HUGO LAGOS, and KIKOLOS TISSANOS.

"2. On May 15, 1975, one ATHANASIOS ATHANASIOU, an admitted illegal alien, holding Greek citizenship, surrendered himself to agents of the Immigration and Naturalization Service at 20 West Broadway, New York, New York. After being advised of his rights, Mr. Athanasiou advised that he had been employed at STEVE'S PIER I RESTAURANT, 33 BAYVILLE AVENUE, BAYVILLE, NEW YORK from October of 1973 till Sunday, May 11, 1975; that as of May 11, 1975 at least eight other persons known to him to be illegal aliens were employed at STEVE'S PIER I RESTAURANT, 33 BAYVILLE AVENUE, BAYVILLE, NEW YORK. That during the last year and a half he has resided in the basement of said restaurant with eleven other individuals in six (6) foot by six (6) foot cubicles. That at least six of the eleven individuals residing in the basement at 33 Bayville Avenue, Bayville,

New York are known to him to be illegal aliens."

Having obtained the warrant, INS agents searched the restaurant and arrested seven illegal aliens on the premises. The Karathanos brothers were then indicted for harboring and concealing these aliens in violation of 8 U.S.C. § 1324.[2] The appellees moved to exclude from their trial any evidence of the presence of the aliens obtained during the search, and the testimony of the aliens themselves, on the ground that the affidavit for the search warrant failed to state probable cause to search. After a hearing, Judge Watson granted the motion, and the government, deeming the excluded evidence essential to its prosecution of the Karathanos brothers, appealed pursuant to 18 U.S.C. § 3731.

## DISCUSSION

Though fine judgments are often required to determine whether an affidavit states facts sufficient to show probable cause for issuance of a search warrant, the basic standard for the decision is well-settled. When an affidavit relies on an informant's time to establish probable cause, the affidavit must, first, set forth "some of the underlying circumstances" forming the basis of the informant's conclusion that there is illegal activity or evidence thereof on the premises, and, second it must state facts which give some assurance that the informant is a credible person. See *Spinelli v. United States,* 393 U.S. 410, 89 S.Ct. 584, 21 L.Ed.2d 637 (1969); *Aguilar v. Texas,* 378 U.S. 108, 84 S.Ct. 1509, 12 L.Ed.2d 723 (1964). The purpose of the "two-pronged" test thus enunciated in *Aguilar* and *Spinelli* is, of course, to assure that the magistrate will not function merely as a rubber stamp but will issue search warrants only when

---

of a felony and upon conviction thereof shall be punished by imprisonment for not more than two years, or by a fine of not more than $1,000, or both."

2. Title 8 U.S.C. § 1324 reads in pertinent part as follows:

"Any person, including the owner, operator, pilot, master, commanding officer, agent,

or consignee of any means of transportation who—

\* \* \* \* \* \*

"(3) willfully or knowingly conceals, harbors, or shields from detection, or attempts to conceal, harbor, or shield from detection, in any place, including any building or any means of transportation; . . . shall be guilty of a felony . . . ."

the facts are sufficient to satisfy a reasonably prudent detached and neutral person that a crime is being committed or evidence of it kept on the premises to be searched and that the informant's information has been obtained by him in a reasonably reliable way rather than through neighborhood gossip, conjecture, or mere suspicion. See *Spinelli v. United States, supra,* 393 U.S. at 416, 89 S.Ct. 584, 21 L.Ed.2d 637. Then only is a limited invasion of a person's privacy sanctioned by the Fourth Amendment.

With this basic framework in mind, we turn our attention to whether the requirements of the first phase of the *Aguilar-Spinelli* test have been met. The only information presented in the Jacobs affidavit[3] to indicate how the informant Athanasiou reached his conclusion that there were illegal aliens at the restaurant is the statement that he had lived on the premises with these aliens. The government, recognizing that the mere presence of aliens (assuming that Athanasiou had a basis for concluding they *were* aliens) would not provide a basis for concluding that they had entered the United States illegally or otherwise violated immigration laws, strenuously argues that his statement gives rise to a reasonable inference that the other aliens must have admitted to him their illegal status, and thus provides sufficient assurance that he reached his conclusion in a reliable way.

■ Unquestionably statements to the informant by the other aliens that they were illegally in the United States would have been sufficient to support a holding that the information was reliably obtained by the informant. See, e.g., *United States v. Sultan,* 463 F.2d 1066, 1068 (2d Cir. 1972). But the affidavit's bald statement that Athanasiou had lived with the other aliens

is an insufficient basis for inferring that they made such incriminating admissions. While co-workers and bunkmates may exchange considerable amounts of information, it can hardly be assumed that, living in fear of arrest and deportation, illegal aliens would have revealed their illegal status to a stranger such as Athanasiou. On the contrary, one would expect this subject to rank high on the list of topics too sensitive to be casually revealed. The unlikelihood that the information was directly revealed by any of the aliens to Athanasiou is heightened by the fact that in depositions taken later in the present proceeding the deposition of Athanasiou was taken in the Greek language whereas the depositions of six out of seven of the seized aliens were taken in the Spanish language, indicating that any communication between him and them would have been handicapped by a language barrier.

■ Rather than hearing any such admissions by the aliens, Athanasiou may simply have concluded that his co-workers were illegal aliens by observing their physical appearance, language characteristics and the fact that they lived in cramped quarters on the premises where they worked. Such observations would be an insufficient basis, however, for determining that the person observed is an illegal alien, since there is no necessary connection between a person's physical, linguistic characteristics, and living arrangements, on the one hand, and the legality of his status, on the other. See *United States v. Brignoni-Ponce,* 422 U.S. 873, 885–87, 95 S.Ct. 2574, 45 L.Ed.2d 607 (1975);[4] *United States v. Mallides,* 473 F.2d 859, 860 (9th Cir. 1973). The fact that the co-workers were boarded in the basement is not inconsistent with traditional employers'

---

**3.** There is no contention that the magistrate was provided with any information other than that contained in the affidavit.

**4.** The Supreme Court did indicate in *United States v. Brignoni-Ponce, supra,* that a person's apparent foreign ancestry, when considered along with suspicious behavior, might provide a "suspicion" of illegal status sufficient to allow him to be briefly questioned about his citizenship. See 422 U.S. at 885–87, 95 S.Ct.

2574. Assuming *arguendo* that such a "suspicion" might have been raised in this case, this would still not be sufficient to uphold the search, since *Brignoni-Ponce* considered only what facts, admittedly falling short of probable cause, would justify less than a full search or arrest by INS agents. See *id.* at 881–83. Cf. *Terry v. Ohio,* 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968).

past treatment of low-paid lawfully admitted immigrants. It is equally consistent to infer that, in tipping the INS that eight illegal aliens were employed on the premises, Athanasiou was simply passing along rumors about various employees which he had collected in the course of his employment at the restaurant; rumors, however, are patently insufficient to provide a sufficient basis for probable cause. If, indeed, Athanasiou obtained his information by direct statements from the aliens rather than by rumor, the Jacob affidavit should have so stated. Its failure to do so is a fatal deficiency.

■ To infer that the informant reached his conclusion in a reliable manner (e.g., through admissions by the aliens) rather than in an unreliable manner (e.g., through rumor or assumptions based on observations of physical appearance and the like) would be to permit a warrant to issue on the basis of a degree of speculation proscribed by the *Aguilar-Spinelli* test. While an affidavit supporting a search warrant should not be read in a grudging or technical manner, *United States v. Ventresca,* 380 U.S. 102, 108–09, 85 S.Ct. 741, 13 L.Ed.2d 684 (1965), neither should it require the magistrate, or a reviewing court, to use imagination to supply essential details critical to determining probable cause. See *Aguilar v. Texas, supra,* 378 U.S. at 114–15, 84 S.Ct. 1509; *Giordenello v. United States,* 357 U.S. 480, 486, 78 S.Ct. 1245, 2 L.Ed.2d 1503 (1958). The affidavit in the present case requires precisely that. We do not mean to imply that in all cases an affidavit must detail precisely how the informant reached his conclusion, but "[i]n the absence of a statement detailing the manner in which the information was gathered, it is especially important that the tip describe the accused's criminal activity in sufficient detail that the magistrate may know that he is relying on something more substantial than a casual rumor circulating in the underworld or an accusation based merely on an individual's general reputation." *Spinelli v. United States, supra,* 393 U.S. at 416, 89 S.Ct. at 589. The present affidavit completely lacks such supporting detail. The

alleged illegal aliens are never named or even described. It furnishes no indication of their nationality, of how they came into the country, or indeed any statement about them other than their number and the conclusion about their illegality.

Our recent decision in *United States v. Pond,* 523 F.2d 210 (2d Cir. 1975), on which the government relies, does not suggest that such an undetailed affidavit would be sufficient. In *Pond,* the affidavit specifically described the baggage which allegedly contained marijuana, and averred that an informant, experienced in smelling marijuana, had detected marijuana fumes coming from the luggage in question. *Id.* at 211–13. The *Pond* affidavit thus made clear what is in the present case still an object of conjecture: the manner in which the informant reached his conclusion about illegal activity.

■ The affidavit's statement that during the past five years 11 illegal aliens had been arrested at the restaurant does not remedy its failure to set forth how the informant obtained his information. To be sure, Chief Justice Burger's opinion in *United States v. Harris,* 403 U.S. 573, 91 S.Ct. 2075, 29 L.Ed.2d 723 (1971), relied on a constable's knowledge of a person's reputation as a moonshiner and on a prior seizure of non-taxpaid whiskey at the person's house to help establish probable cause to search for illegal liquor. However, in *Harris* there was no doubt that the affidavit met the first prong of the *Aguilar-Spinelli* test—the requirement that the affidavit show how the informant secured his information; it recited that the informant had personally purchased non-taxpaid whiskey and had observed others doing so. The prior history of criminal activity in *Harris* was held sufficient, when considered along with other evidence, to allow the affidavit to pass the second prong of the *Aguilar-Spinelli* test: the requirement that the credibility of the informant be established, or, put another way, that the affidavit must give the magistrate a " 'substantial basis' for crediting the hearsay" account by the

informant of how he obtained the information. See 403 U.S. at 579–80, 91 S.Ct. 2075 at 2080. In our view, the *Harris* opinion does not suggest that when an affidavit clearly fails to pass the first prong of the test, the addition of a recital of past criminal activity may serve as an acceptable substitute for probable cause standards that have not been met. Cf. *United States v. McNally,* 473 F.2d 934, 938–39 (3d Cir. 1973) (holding that *Harris* did not overrule two-pronged test).[5] If such a recital were sufficient to remedy the deficiency, any tip, no matter how unreliably obtained, would suffice to allow a search, provided it could be shown that the owner of the premises had a record of prior similar criminal offenses. While past involvement in criminal activity carries some weight, it will not supplant the necessity of showing how the informant obtained his information. We thus hold that the affidavit fails to state facts sufficient to indicate probable cause to search, and that the search warrant was therefore improperly issued.[6]

Upon this appeal the government seeks for the first time to avoid the sanction which would normally follow as a matter of course from our holding that the warrant was issued without probable cause, i.e., the exclusion of the evidence obtained as a result of the search from the trial of the appellees. We are asked to modify the exclusionary rule so as to make it inapplicable whenever law enforcement agents have

followed the preferred course of going to a magistrate to obtain a search warrant, even though the warrant turns out to have been improperly issued. The basic contention, which was not made before Judge Watson, is that in such a case the rule does not serve to deter unconstitutional searches because the unconstitutionality of the search is due only to a mistake in judgment on the part of the magistrate, and not to any bad faith on the part of the officers. There the rule does not serve any deterrent function, the argument continues, its use should be avoided since it then serves only to exclude probative evidence.

In response appellees challenge the good faith of the INS agents who obtained the warrant in the present case, contending that material representations in the Jacobs affidavit were false and that two warrantless searches simultaneously made by the agents of the home of John Karathanos and of a nearby resident indicate that the agents were engaged in a general dragnet operation. Since an issue was thus raised as to whether the magistrate was misled, it is argued that the government should at this stage be precluded from assuming that the agents acted in good faith. If the agents' good faith should turn out to be material, appellees argue that they are at least entitled to an evidentiary hearing on the issue. See *United States v. Dunnings,* 425 F.2d 836, 840 (2d Cir. 1969), *cert. denied,*

---

5. The *McNally* court ultimately upheld the search involved in that case despite defects in the affidavit on the ground that independent police investigation had provided evidence of suspicious conduct sufficient, when considered along with the informant's tip, to provide probable cause. See 473 F.2d at 939–40. There is no comparable evidence resulting from investigation by the INS agents in this case.

6. Our decision that the Jacobs affidavit is insufficient for failure to state the source of the informant's information and the circumstances forming the basis for its statement that the aliens were "illegal" makes it unnecessary to determine whether, assuming the aliens were deportable, there was probable cause to support the affiant's statement that they had violated 8 U.S.C. § 1325, which makes it a crime to enter the United States illegally. However, in the absence of any facts or circumstances

regarding the manner of the aliens' entry, the mere assertion that the aliens are "illegal" would not be sufficient to support an inference of violation of § 1325, since the aliens may well have become deportable because of conduct prior to or after a lawful entry, such as an overstay of allotted time as visitors or crewmen, see 8 U.S.C. § 1101(a)(15)(B), the failure to maintain a lawful status as students or transits after lawful entry, or the existence of some other ground unconnected with illegal entry, see 8 U.S.C. § 1251(a). The informant himself, for instance, although described as an "illegal alien" in the Jacobs affidavit had entered the United States lawfully as a visitor and overstayed his allotted time, which is not a violation of § 1325. Similarly the "illegal" alien referred to in Count Seven, Lam Mang Fuk, entered lawfully.

397 U.S. 1002, 90 S.Ct. 1149, 25 L.Ed.2d 412 (1970).

■ Were we considering the advisability of adopting an exclusionary rule prior to definitive landmark Supreme Court decisions on the subject, the government's thesis would provide an intriguing suggestion for possible formulation of a somewhat different version of the rule. See Oaks, *Studying the Exclusionary Rule in Search and Seizure*, 37 U.Chi.L.Rev. 665 (1970); Amsterdam, *Search, Seizure and Section 2265: A Comment*, 112 U.Pa.L.Rev. 378 (1964). But see Amsterdam, *Perspectives on the Fourth Amendment*, 58 Minn.L.Rev. 349, 476 n.598 (1974). However, no purpose is served by pursuing the government's suggestion, since decisions of the Supreme Court outlining the scope of the exclusionary rule offer no support for limiting it in this manner. The landmark discussions of the rule clearly regard it as a remedy to be applied whenever the search in question does not comply with Fourth Amendment standards, regardless of the presence or absence of a warrant and the good or bad faith of the police officers. See *Mapp v. Ohio*, 367 U.S. 643, 81 S.Ct. 1684, 6 L.Ed.2d 1081 (1961); *Weeks v. United States*, 232 U.S. 383, 34 S.Ct. 341, 58 L.Ed. 652 (1914). The Supreme Court has specifically ordered the exclusion of evidence even when the unconstitutionality of the search resulted only from what might be termed a magistrate's error of judgment in determining probable cause. See *Aguilar v. Texas, supra; Giordenello v. United States, supra; Byars v. United States*, 273 U.S. 28, 47 S.Ct. 248, 71 L.Ed. 520 (1927). In the face of such an unvarying application of the rule by the Supreme Court, even if we were convinced that the rule should be modified as suggested by the government, it would be inappropriate for this court to do so since, as we said in *Salerno v. American League of Professional Baseball Clubs*, 429 F.2d 1003, 1005 (2d Cir. 1970), *cert. denied*, 400 U.S. 1001, 91 S.Ct. 462, 27 L.Ed.2d 452 (1971), with rare exceptions not here applicable, "we continue to believe that the Supreme Court should retain the exclusive privilege of overruling its own decisions . . . ."

Moreover, we are unpersuaded by the arguments of policy underlying the government's position. Given the fragmentary empirical evidence regarding the actual effectiveness of the exclusionary rule in deterring unconstitutional searches,[7] any discussion of its deterrent effects must be undertaken with considerable humility. However, there is no reason to assume that the rule does not help to deter unconstitutional searches even when applied in cases such as the present one, where the evidence was seized pursuant to a warrant issued without probable cause. While we do not assume that United States magistrates or state officials authorized to issue search warrants are necessarily prone to act as the "rubber stamp[s] for the police" condemned in *Aguilar v. Texas, supra*, 378 U.S. at 111, 84 S.Ct. 1509, the exclusionary rule's effect of making them aware that their decision to issue a search warrant is a matter of importance not only in regard to the constitutional rights of the person to be searched, but also in regard to the success of any subsequent criminal prosecution, may well induce them to give search warrant applications the scrutiny which a proper regard for the Fourth Amendment requires, see *id.*

The suggested modification of the exclusionary rule might also have a significant, albeit indirect, effect on the behavior of

---

**7.** An extensive recent study of the effects of the exclusionary rule concludes that the study's findings "represent the largest fund of information yet assembled on the effect of the exclusionary rule, but they obviously fall short of an empirical substantiation or refutation of the deterrent effect of the exclusionary rule." Oaks, *Studying the Exclusionary Rule in Search and Seizure*, 37 U.Chi.L.Rev. 665, 709 (1970). While Professor Oaks does suggest that the rule be abandoned when an effective tort remedy against police for illegal searches is available, he characterizes this position as a "polemic" not based on the available empirical evidence. See *id.* at 754–57. For a collection of, and brief criticisms of, some of the other empirical studies of the rule, see Amsterdam, *Perspectives on the Fourth Amendment*, 58 Minn.L.Rev. 349, 475 n.593 (1974).

police officers. If a magistrate's issuance of a warrant were to be, as the government would have it, an all but conclusive determination of the validity of the search and of the admissibility of the evidence seized thereby, police officers might have .a substantial incentive to submit their warrant applications to the least demanding magistrates, since once the warrant was issued, it would be exceedingly difficult later to exclude any evidence seized in the resulting search even if the warrant was issued without probable cause. The suggestion that "magistrate-shopping" or patronization by the police of lenient or "rubber stamp" justices of the peace could be remedied by removal of the offenders ignores the fact that many state officials entitled to issue search warrants are elected to office.[8] For practical purposes, therefore, the standard of probable cause might be diluted to that required by the least demanding official authorized to issue warrants, even if this fell well below what the Fourth Amendment required. By contrast, the present universal application of the exclusionary rule to all unconstitutional searches gives law enforcement officers no comparable incentive to seek out the most lenient magistrates. In sum, while any appraisal of the effectiveness of the exclusionary rule cannot claim to be conclusive, we cannot accept the view that the rule patently lacks any deterrent function in cases such as the present one.[9]

The final contention advanced by the government is that the exclusionary rule should be applied here only to bar introduction of the evidence obtained during the search—primarily the INS agents' testimony about the presence of the illegal aliens on the premises—but not to exclude the testimony of the arrested aliens about their relationships with the Karathanos brothers. It is urged that the combination of circumstances in this case—the INS agents' obtaining of a warrant and the aliens' decision voluntarily to testify against the Karathanos brothers—is sufficient to break the connection between the original illegal search and the testimony. We must, of course, appraise this question under the principles set out in *Wong Sun v. United States*, 371 U.S. 471, 487–88, 83 S.Ct. 407, 417, 9 L.Ed.2d 441 (1963):

"We need not hold that all evidence is 'fruit of the poisonous tree' simply because it would not have come to light but for the illegal actions of the police. Rather, the more apt question in such a case is 'whether, granting establishment of the primary illegality, the evidence to which instant objection is made has been come at by exploitation of that illegality or instead by means sufficiently distinguishable to be purged of the primary taint.' Maguire, Evidence of Guilt 221 (1959)."

Mapping all the distinctions between such "fruits of the poisonous tree" and a healthy harvest fit for court consumption is a task which has recently led even one distinguished commentator to throw up his hands in despair, see Amsterdam, *Perspectives on the Fourth Amendment*, 58 Minn.L. Rev. 349, 361 (1974). However, our previous decision in *United States v. Tane*, 329 F.2d 848 (2d Cir. 1964), provides some guidance. In *Tane*, where a witness had agreed to testify after his identity had been discovered by an illegal wiretap and he had been

---

**8.** To take but one example, county court judges in New York State are authorized to issue search warrants. See N.Y.Crim.Proc.L. §§ 10.-10, 690.05. Under the state constitution, these judges are elected for 10-year terms, N.Y. Const. art. 6, § 10, and are removable for cause only after full hearings by the court on the judiciary, or upon the recommendation of the governor by a two-thirds vote of the state senate. *Id.*, art. 6, §§ 22, 23b.

**9.** *Michigan v. Tucker*, 417 U.S. 433, 94 S.Ct. 2357, 41 L.Ed.2d 182 (1974), does not indicate that the Supreme Court is about to undertake a sweeping reformulation of the Fourth Amendment exclusionary rule. The Court's conclusion that no purpose would be served by applying the Fifth Amendment exclusionary rule in the circumstances of *Tucker* was grounded in the fact that the police officers had there fully complied with the constitutional standards in effect at the time of the arrest. See 417 U.S. at 443–46, 94 S.Ct. 23, 57. Here, by contrast, the appellees' Fourth Amendment rights were clearly violated by the search.

confronted with transcripts of the wire-tapped conversations, we rejected the argument that his decision to testify was a sufficient intervening act to allow the testimony to be used at trial, and held that the testimony must be excluded because "[t]he road from the tap to the testimony may be long, but it is straight." 329 F.2d at 853. From *Tane*, it is clear that the fact that a living witness, rather than inanimate evidence, is derived from an illegal search does not necessarily render the witness' testimony admissible at trial. See also *United States v. Garcilaso de la Vega*, 489 F.2d 761, 763 (2d Cir. 1974).

The government seeks to distinguish *Tane* on the ground that *Tane* involved a deliberate violation of Fourth Amendment rights, while here the INS agents acted in good faith by obtaining a search warrant. Our opinion, however, did not rest on the nature of the police officers' conduct, but rather on the closeness of the connection between the original illegality and the witness' testimony. See 329 F.2d at 853. Moreover, while the "purpose and flagrancy of the official misconduct" are indeed relevant considerations in determining how far the taint of the original illegality extends, *Brown v. Illinois*, 422 U.S. 590, 603–04, 95 S.Ct. 2254, 45 L.Ed.2d 416 (1975); see *United States v. Edmons*, 432 F.2d 577, 584–85 (2d Cir. 1970), the fact that the agents obtained a warrant is far from conclusive in resolving the admissibility of the aliens' testimony since, for reasons already stated, the exclusionary rule still performs a significant function in such a case. Indeed, *Brown v. Illinois* itself, in holding that the giving of *Miranda* warnings to an illegally arrested person did not, by itself, suffice to make a confession admissible, warned against adopting any such "talismanic test[s]" to resolve the question of the scope of the taint of an illegal search. 422 U.S. at 603, 95 S.Ct. 2254.

In the present case, there is a close connection between the initial illegal search and the testimony which the government seeks to use at trial. The purpose of the search, as described in the application for the warrant, was to seize the illegal aliens; it is these same aliens who are now the government's prospective witnesses. Once the aliens were arrested, the INS agents had obtained considerable leverage over them, since it was within the government's discretion to prosecute and deport them, or to allow them to leave the United States voluntarily. See 8 U.S.C. § 1252(b). If deported, the aliens would be permanently ineligible to receive visas to re-enter the country, see 8 U.S.C. § 1182(a)(17), while voluntary departure at one's own expense carries no similar penalty of permanent exclusion. The government concedes that the aliens' testimony was prompted by the use of this leverage; their agreement to testify came only after a promise to allow them to voluntarily depart without prosecution. In these circumstances, we think their decisions to testify cannot accurately be characterized as intervening "act[s] of free will" of sufficient independence "to purge the primary taint of the unlawful invasion." *Wong Sun v. United States, supra*, 371 U.S. at 486, 83 S.Ct. at 417. The testimony is the not unpredictable result of the influence which the government possessed over the aliens once they had been arrested during the initial illegal search, and if such reasonably foreseeable fruits of the search were deemed admissible, it might help induce similar future searches without probable cause in the hope that they would uncover aliens who could be similarly prompted to testify.

Accordingly, we affirm the decision below and remand the case for further proceedings consistent with this opinion.

OAKES, Circuit Judge (concurring):

I agree with everything that Judge Mansfield has said in his opinion and join therein. I would add only that, as Professor Amsterdam has so aptly pointed out, criticism of the exclusionary rule has been directed, as was the Government's argument in this case, at the rule as if it were a means to "deter" specific episodes of past unconstitutional police behavior. In fact, the exclusionary rule should be looked at as

the principal means for ensuring governmental performance of the obligations imposed by the Fourth Amendment upon the system of criminal justice as a whole. *See* Amsterdam, *Perspectives on the Fourth Amendment,* 58 U.Minn.L.Rev. 349, 432 (1974). The misdirected criticism of the exclusionary rule stems from an unduly narrow view of the Fourth Amendment which conceives of it as a collection of protections of individual spheres of interest, rather than as a broad regulatory canon of Government pertaining to law enforcement procedures which keeps us all secure against the conduct it condemns. *See* Amsterdam, *supra,* 58 U.Minn.L.Rev. at 367; *United States v. Barbera,* 514 F.2d 294, 299 n.12 (2d Cir. 1975).

VAN GRAAFEILAND, Circuit Judge (dissenting):

The search warrant in this case was issued by a United States magistrate sitting in the Eastern District of New York, who, before he assumed office, took the same oath to administer justice as did the judges of this Court. 28 U.S.C. §§ 631(f), 453. The proper role for a reviewing court is to show deference to a determination of probable cause made by such a magistrate, *United States v. Rahn,* 511 F.2d 290, 292 (10th Cir.), *cert. denied,* 423 U.S. 825, 96 S.Ct. 41, 46 L.Ed.2d 42, 44 U.S.L.W. 3201 (October 7, 1975); *United States v. DePugh,* 452 F.2d 915, 921 (10th Cir. 1971), *cert. denied,* 407 U.S. 920, 92 S.Ct. 2452, 32 L.Ed.2d 805 (1972), with any doubt being resolved in favor of upholding the search warrant he issued. *United States v. Ventresca,* 380 U.S. 102, 106, 85 S.Ct. 741, 13 L.Ed.2d 684 (1965); *Iverson v. North Dakota,* 480 F.2d 414 (8th Cir. 1973), *cert. denied,* 414 U.S. 1044, 94 S.Ct. 549, 38 L.Ed.2d 335 (1974); *Griffin v. Hudson,* 475 F.2d 814, 815 (6th Cir. 1973).

We have held that in close cases the very fact that a magistrate found probable cause is itself a substantial factor tending to uphold the validity of a warrant. *United States v. Ramirez,* 279 F.2d 712, 716 (2d Cir.), *cert. denied,* 364 U.S. 850, 81 S.Ct. 95,

5 L.Ed.2d 74 (1960); *United States v. Freeman,* 358 F.2d 459, 462 (2d Cir.), *cert. denied,* 385 U.S. 882, 87 S.Ct. 168, 17 L.Ed.2d 109 (1966). We have also said that "one of the best ways to foster increased use of warrants is to give law enforcement officials the assurance that when a warrant is obtained in a close case, its validity will be upheld." *United States v. Lewis,* 392 F.2d 377, 379 (2d Cir.), *cert. denied,* 393 U.S. 891, 89 S.Ct. 212, 21 L.Ed.2d 710 (1968). In *United States v. Desist,* 384 F.2d 889, 897 (2d Cir. 1967), *aff'd,* 394 U.S. 244, 89 S.Ct. 1030, 22 L.Ed.2d 248 (1969), we said that warrants issued by an independent magistrate will be examined less rigorously than searches without a warrant. Instead of following this oft-stated and salutary rule, the majority has, I fear, examined the warrant and supporting affidavit herein with the same "microscopic intensity" they would use if it were a municipal bond, *United States v. Pond,* 523 F.2d 210, 214 (2d Cir. 1975), or a trust indenture, *United States v. Desist, supra,* 384 F.2d at 897.

There is no magic formula which a magistrate follows in determining whether there is probable cause for the issuance of a search warrant, and precedent is of little value. The existence of probable cause depends on the facts and circumstances of each particular case, and decided cases are helpful only in declaring the general rule. *United States v. Ramirez, supra,* 279 F.2d at 714. The affidavit which is submitted to the magistrate is usually drafted by a non-lawyer in the course of a rapidly moving criminal investigation and should be tested in a common-sense and realistic fashion. *United States v. Ventresca, supra,* 380 U.S. at 108, 85 S.Ct. 741; *United States v. Lewis, supra,* 392 F.2d at 379; *United States v. Manfredi,* 488 F.2d 588, 599 (2d Cir. 1973), *cert. denied,* 417 U.S. 936, 94 S.Ct. 2651, 41 L.Ed.2d 240 (1974); *United States v. Wong,* 470 F.2d 129, 131 (9th Cir. 1972); *Iveson v. North Dakota, supra,* 480 F.2d at 418. A hypertechnical reading should be avoided. *United States v. Spach,* 518 F.2d 866, 872 (7th Cir. 1975); *United States v. Holliday,* 474 F.2d 320, 321 (10th Cir. 1973). Reasonable inferences from the facts stated are not

precluded. *United States v. Pond, supra,* 523 F.2d at 213. Finally, and most importantly, the magistrate need not be convinced of the existence of the evidence sought to be uncovered by the search. It is sufficient if there is a substantial basis for him to conclude that it exists. *United States v. Burke,* 517 F.2d 377, 381 (2d Cir. 1975).

Using the above criteria as our guide, let us now put ourselves in the position of the magistrate in the instant case and decide whether we, as prudent persons, would believe that an offense was being committed on defendants' premises. *McCray v. Illinois,* 386 U.S. 300, 304, 87 S.Ct. 1056, 18 L.Ed.2d 62 (1967). Would the flags fly and the rockets go off when we read that Mr. Athanasiou, an illegal alien, had been living for one and one-half years with eleven other persons in "six (6) foot by six (6) foot cubicles" in the basement of defendants' restaurant? Or, would we simply "ho-hum" this information by saying, as does the majority, that this "is not inconsistent with *traditional* employers' *past* treatment of law-paid lawfully admitted immigrants"? (Emphasis supplied).

Would we recognize that the information supplied by Mr. Athanasiou is "*toto coelo* removed from a 'meager report' that 'could easily have been obtained from an offhand remark heard at a neighborhood bar', as to which prior history of providing accurate information is required, *Spinelli v. United States,* 393 U.S. 410, 417, 89 S.Ct. 584, 589, 21 L.Ed.2d 637 (1969)"? *United States v. Burke, supra,* 517 F.2d at 381; *United States v. Rollins,* 522 F.2d 160, 164 (2d Cir. 1975). Would we be appreciative of the fact that Mr. Athanasiou was not an unknown informant passing on idle rumor or irresponsible conjecture but was, himself, a confessed participant in and victim of a crime allegedly taking place on defendants' premises? *United States v. Burke, supra,* 517 F.2d at 380; *United States v. Miley,* 513 F.2d 1191, 1204 (2d Cir. 1975). Would we agree that an admission against penal interest is a "significant, and sometimes conclusive, reason for crediting the statements of an informant"? *Armour v. Salisbury,* 492 F.2d 1032, 1035 (6th Cir. 1974); *United States v. Mahler,* 442 F.2d 1172, 1175 (9th Cir.), *cert. denied,* 404 U.S. 993, 92 S.Ct. 541, 30 L.Ed.2d 545 (1971); *Agnellino v. New Jersey,* 493 F.2d 714, 726 (3d Cir. 1974).

Would we ignore the fact that, during the past five years, at least eleven named illegal aliens had been apprehended on defendants' premises? Would we consider it unusual that Mr. Athanasiou, himself an illegal alien residing in defendants' basement, "knew" that six other people with whom he had resided in that basement for one and one-half years were also illegal aliens? Would we consider Mr. Athanasiou, illegally living in defendants' basement, a "stranger" to the other illegal aliens with whom he resided in such close quarters for eighteen months, so that none of them would reveal their similar illegal status? Would we completely ignore the commonly accepted truism that "birds of a feather flock together"?

If we answer all these questions as does the majority, we would not issue the warrant. However, if we do not, and if we recognize that "only a probability of criminal activity is necessary for there to be probable cause", *United States v. Gimelstob,* 475 F.2d 157, 160 (3d Cir.), *cert. denied,* 414 U.S. 828, 94 S.Ct. 49, 38 L.Ed.2d 491 (1973), we would issue it, and properly so. The fact that I am dissenting indicates what my own answers would be.

### The Nature of the Sanction

My brothers correctly hold that the privilege of overruling Supreme Court decisions should ordinarily remain with that court. However, having professed our adherence to this rule, we are duty bound to see that our pronouncements concur with those of the majority of the members of that Court. Moreover, we need not wait for the proverbial "brown cow" case to be decided before moving in the same direction as that majority.

In *United States v. Calandra,* 414 U.S. 338, 348, 94 S.Ct. 613, 38 L.Ed.2d 561 (1974),

Mr. Justice Powell, speaking for the majority, said of the exclusionary rule:

In sum, the rule is a judicially created remedy designed to safeguard Fourth Amendment rights generally through its deterrent effect, rather than a personal constitutional right of the party aggrieved.

This Court said substantially the same thing in *United States v. Burke, supra,* 517 F.2d at 386 n.12:

In contrast to cases involving confessions or identifications, where exclusion not only may tend to enforce decent police practices but may prevent the introduction of unreliable evidence, exclusion in Fourth Amendment cases generally can serve only the former function.

We have recognized that there is a growing disenchantment with the exclusionary rule, *United States v. Artieri,* 491 F.2d 440, 446 (2d Cir.), *cert. denied,* 417 U.S. 949, 95 S.Ct. 142 (1974), and such disenchantment is particularly apparent when it is applied in cases such as this. We have stated that the rule is a "blunt instrument, conferring an altogether disproportionate reward not so much in the interest of the defendant as in that of society at large." *United States v. Dunnings,* 425 F.2d 836, 840 (2d Cir. 1969), *cert. denied,* 397 U.S. 1002, 90 S.Ct. 1149, 25 L.Ed.2d 412 (1970). Should we not, then, look at the latest decisions of the Supreme Court to see whether it is moving away from the harshness of this rule?

In *Michigan v. Tucker,* 417 U.S. 433, 447, 94 S.Ct. 2357, 2365, 41 L.Ed.2d 182 (1974), Mr. Justice Rehnquist, speaking for the court, said:

The deterrent purpose of the exclusionary rule necessarily assumes that the police have engaged in willful, or at the very least, negligent conduct which has deprived the defendant of some right. By refusing to admit evidence gained as a result of such conduct, the courts hope to instill in those particular investigating officers, or in their future counterparts, a greater degree of care toward the rights of an accused. Where the official action was pursued in complete good faith, how-ever, the deterrence rationale loses much of its force.

This language is peculiarly apposite to the situation with which we are dealing and is, I think, a signpost indicating the direction in which we should be traveling. The statement of the majority that "there is no reason to assume that the [exclusionary] rule does not help to deter unconstitutional searches" is a rather weak argument against so doing.

The Court in *Tucker* also stated at 448, 94 S.Ct. at 2366:

Whatever deterrent effect on future police conduct the exclusion of those statements may have had, we do not believe it would be significantly augmented by excluding the testimony of the witness Henderson as well.

and at page 451, 94 S.Ct. at 2367:

To extend the excision further under the circumstances of this case and exclude relevant testimony of a third-party witness would require far more persuasive arguments than those advanced by respondent.

Mr. Justice White, in concurring, said at page 461, 94 S.Ct. at 2372:

*Miranda* having been applied in this Court only to the exclusion of the defendant's own statements, I would not extend its prophylactic scope to bar the testimony of third persons even though they have been identified by means of admissions that are themselves inadmissible under *Miranda.* The arguable benefits from excluding such testimony by way of possibly deterring police conduct that might compel admissions are, in my view, far outweighed by the advantages of having relevant and probative testimony, not obtained by actual coercion, available at criminal trials to aid in the pursuit of truth.

If we are not yet prepared to follow in the direction in which *Tucker* indicates the Supreme Court is traveling, we should not resolutely set our faces in the opposite direction. I respectfully dissent from the

opinions of my brothers which appear to me to do exactly that.[1]

---

1. Were I not dissenting, I would nonetheless disassociate myself from the majority's remarks concerning "magistrate-shopping", "patronization by the police of lenient or 'rubber-stamp' justices of the peace" or "least demanding" or "most lenient" magistrates. The majority's implication that justices of the peace and other elected state officials who are entitled to issue search warrants are not honorable and dedicated men does them a grave disservice. Moreover, the majority's willingness not to assume that United States magistrates are "necessarily prone" to act as rubber stamps is damning with exceedingly faint praise. The concept of unscrupulous police and amenable magistrates being thwarted in their conspiratorial aims only by our vigilance has little basis in actual fact and certainly none in this case.