UNITED STATES of America

v.

Robert WYLER and Dianne
Becker, Defendants.

No. 79 Cr. 779.

United States District Court,
S. D. New York.

Oct. 24, 1980.

See also, D.C., 502 F.Supp. 959.

John S. Martin, U. S. Atty. by Minna
Schrag, Asst. U. S. Atty., New York City,
for United States of America.

Paul Goldberger, Goldberger, Feldman,
Dubin & Young, New York City, for de-
fendant, Robert Wyler.

Jerry Feldman, Goldberger, Feldman,
Dubin & Young, New York City, for de-
fendant, Dianne Becker.

PIERCE, District Judge.

OPINION AND ORDER

The Court has previously granted defend-
ants' motion to suppress physical evidence
unlawfully seized from a house which they
rented at 3800 N.W. 89th Avenue, Holly-
wood, Florida (hereinafter "3800" or the
"Florida house" alternatively) and which
was entered and searched by federal agents
without a warrant. Among the documents
seized during that search the government
found the names of one William Miles and
Gulfport Seafoods Co. International (here-
inafter "Gulfport"). Approximately six
months later, the agents located Miles and
interviewed him. During the interview
they learned about the extortion charged in
this indictment. The Court now addresses
whether the statements and testimony of
William Miles, the victim of the alleged
extortion, must be suppressed as a "fruit"
of the unlawful search.

The government contends, *inter alia*, that
the motion to suppress Miles' testimony

should be denied because the evidence of this live witness has become so attenuated from the unlawful search as to dissipate the taint of the illegality. *Wong Sun v. United States*, 371 U.S. 471, 487–88, 83 S.Ct. 407, 417, 9 L.Ed.2d 441, 455 (1963).

At an "attenuation" hearing the government presented two witnesses, F.B.I. Special Agent Christopher Mattiase and William Miles. After considering their testimony and having observed the demeanor of these witnesses during the hearing, the Court finds that the testimony of William Miles will be admissible during a trial of the charges in the indictment. Accordingly, the Court denies the motion to suppress Miles' testimony based upon the findings set forth hereinbelow.

## DISCUSSION

■ It is well settled that the exclusionary rule is applicable to both direct and indirect products of unlawful searches, *Silverthorne Lumber Co. v. United States*, 251 U.S. 385, 40 S.Ct. 182, 64 L.Ed. 319 (1920), and that it protects against the use of unlawfully obtained verbal statements as well as use of papers and other physical evidence. *Wong Sun v. United States, supra*, 371 U.S. at 485, 83 S.Ct. at 416. Thus, "verbal evidence which derives so immediately from an unlawful entry . . . is no less the 'fruit' of official illegality than the more common tangible fruits of the unwarranted intrusion." *Id.* Yet, unlawfully obtained "fruits" are not *per se* inadmissible. Rather, as the Court concluded in *Wong Sun*:

> "We need not hold that all evidence is 'fruit of the poisonous tree' simply because it would not have come to light but for the illegal actions of the police. Rather, the more apt question in such a case is 'whether, granting establishment of the primary illegality, the evidence . . . has been come at by exploitation of that illegality or instead by means sufficiently distinguishable to be purged of the primary taint.' " Maguire, Evidence of Guilt 221 (1959).

*Id.* at 487–88, 83 S.Ct. at 417.

In support of its claim of attenuation the government relies upon the standards set forth in *United States v. Ceccolini*, 435 U.S. 268, 98 S.Ct. 1054, 55 L.Ed.2d 268 (1978) and *United States v. Leonardi*, 623 F.2d 746 (2d Cir. 1980). Also relying upon *Ceccolini*, the defendants additionally urge, *inter alia*, that Miles' testimony should be suppressed based upon the holdings of *United States v. Scios*, 590 F.2d 956 (D.C.Cir.1978) (en banc); *United States v. Karathanos*, 531 F.2d 26 (2d Cir.), *cert. denied*, 428 U.S. 910, 96 S.Ct. 3221, 49 L.Ed.2d 1217 (1976); and *United States v. Tane*, 329 F.2d 848 (2d Cir. 1964).

The holdings in these cases instruct that a determination by this Court should not be predicated solely "on the basis of causation in the logical sense", *United States v. Ceccolini, supra*, 435 U.S. at 274, 98 S.Ct. at 1059. Rather, while "no mathematical weight can be assigned to any of the factors", *id.* at 280, 98 S.Ct. at 1062, this Court's determination of attenuation must be based upon the totality of the circumstances and events surrounding the witness' testimony.

*Ceccolini*, *Leonardi* and *Scios* present an array of factors which the Court may consider in determining attenuation. They include:

a. Whether the identity and relationship of the witness would have been known to the investigators without the illegally seized evidence.

b. Whether the witness' testimony was an act of free will, neither coerced nor induced by official authority.

c. Whether the illegally seized evidence was used in questioning the witness.

d. The passage of time between the seizure, the initial contact with the witness and the time of trial.

e. Whether the purpose of the search was to find evidence or identify witnesses.

f. Whether application of the exclusionary rule in this context would deter future police misconduct.

## IDENTITY OF THE WITNESS AS TAINTED FRUIT

When the agents entered the Florida house they found documents relating to

"Shawn's Camelot" (a nightclub owned by defendant Shawn Becker), William Miles, and his company, Gulfport. F.B.I. agent Mattiase and DEA agent Oakes were, and had been engaged in, a joint investigation seeking information about the defendant Robert Wyler, who was then a fugitive; any involvement by him in illegal drug trafficking; and any racketeering activities on his part. Specifically, they were seeking to locate Wyler and to ascertain information about any use of monies obtained from drug sales in the operation of legitimate businesses. After finding the names of Gulfport and Miles at the Florida house, they determined to locate and question him about his involvement with Robert Wyler and Shawn Becker.

Prior to the unlawful search, the government had received information about Gulfport from the Sheriff's Office in the town of Gulfport, Mississippi. In 1976 or early 1977 that office had instituted an investigation into allegations that the company had used its boats for narcotics shipments. Apparently, no conclusions were reached by these Mississippi authorities regarding these allegations.

Although the government had this information regarding Gulfport they had no knowledge of the identity of William Miles, nor of any relationship between Miles and Wyler, until the unlawful search occurred at the Florida house, when they discovered documents mentioning both Miles and Gulfport. Agent Mattiase explicitly testified that "*he* first learned about Miles from the documents seized in the Florida house" and that Miles' name had not earlier come to *his* attention. The evidence at the hearing establishes that the records illegally seized on May 29, 31, 1978 contained no clue to the crimes charged in the indictment. On their face they were business records relating to Shawn Becker's affairs. Mattiase admitted

that he had no knowledge of the crime until he questioned Miles. Miles testified that he did not report the crimes charged in this indictment to any federal law enforcement officials until November 29, 1978 when he told the federal agents about the extortion.[1]

The Court finds the testimony of Mattiase and Miles on this issue to be credible and finds that the federal agents had no knowledge of the extortion charged in this indictment until Miles was interviewed at DEA headquarters in November 1978. Additionally, the Court finds that "but for" the documents seized unlawfully at the Florida house on May 29 and 31, 1978, the agents would have had no knowledge of Miles' "existence, identity and potential value as a witness", *United States v. Leonardi, supra*, at 752, and therefore would, in all likelihood, not have discovered the alleged crimes.

To the extent that the government argues that Miles' identity would have been learned through "inevitable discovery", *United States v. Falley*, 489 F.2d 33, 40–41 (2d Cir. 1973) because of the leads provided by the Mississippi sheriff's office, based on the evidence presented during the hearing, the Court concurs with the view of the defendants that this claim is much too speculative to credit.

## VOLUNTARINESS AND USE OF TAINTED FRUIT IN QUESTIONING

As discussed, "but for" the unlawful search the identity of Miles and the existence of the crimes charged in this indictment would not have been known to the government. However, as the Court in *Wong Sun* and *Ceccolini* has cautioned, "but for" causation, while an important factor which the Court must consider, is, standing alone, an insufficient basis upon which to suppress the testimony of a live witness.

1. Miles testified that he did not report the incidents surrounding his assault until late spring of 1977. At that time, in response to the insistence of a resident female friend who, he states, was frightened, and after having received several intimidating telephone calls from persons he believed to have been involved in the alleged earlier extortion, he contacted the 24th Precinct of the New York City Police Department. He reported the incidents to uniformed officers who came to his home and then to detectives at the precinct. They referred him to the District Attorney's Office. He never contacted that office nor any other law enforcement agency until November 1978 when he spoke with Agents Mattiase and Oakes.

Restating the principles of *Ceccolini* this Circuit has recently held that "where the identity and potential usefulness of a witness is revealed as the result of an unlawful search, the willingness of that individual to testify . . . represents a significant attenuation of the link between the police misconduct and its evidentiary fruits." *United States v. Leonardi, supra,* at 752. However, "for an act of free will [in testifying] to operate as a dissipation of taint, it must occur in circumstances devoid of coercion." *United States v. Scios,* supra, at 960.

At the attenuation hearing the government initially sought to demonstrate the voluntariness of Miles' statements to the agents through the testimony of Agent Mattiase, who stated that Miles came to the DEA office voluntarily, in response to a telephone call from Mattiase. Once there, he was questioned by Agents Mattiase and Oakes about his association with Wyler. Because of his acknowledged association with the defendant Wyler, a DEA fugitive, Miles was given *Miranda* warnings prior to the commencement of questioning and signed a waiver of his rights.

Although Agent Mattiase interviewed Miles "armed with the knowledge of what was in the unlawfully seized documents," he testified that he never referred to their contents in any of his questions. Mattiase did use photographs seized from the Florida house and notes gleaned in part from documents taken during the illegal intrusion. There is no evidence that any reference to the agent's notes prompted Miles' responses and the photographs were shown to Miles only *after* he had revealed the alleged crimes and related the circumstances surrounding them. Thus, while some use was made of photographs and information obtained from records seized from the Florida house in questioning the witness, they were not used to induce his statement.

As the alleged victim, Miles' testimony must be considered crucial to the government's case in the eventual trial of this matter. Accordingly, in considering whether to suppress that testimony as "tainted fruit", the Court deemed it essential that Miles, himself, testify at the attenuation hearing regarding the voluntariness of his statements to the federal agents and the circumstances surrounding his interview with them.

Miles testified and corroborated the testimony of Agent Mattiase that he was told that the agents were investigating a narcotics matter, and that he was not a suspect. He was also asked about Gulfport and his relationship to the company, about the financial arrangements for the company, and about the involvement of Shawn Becker and Robert Wyler. He then voluntarily revealed the circumstances surrounding the extortion charged in this indictment, a matter about which the agents had no knowledge at the time. His direct testimony concluded with his statement that when he went to the DEA office at the invitation of the agents and spoke with them he "felt under no pressure whatsoever to talk with them."

Miles' behavior on the day of the interview confirms the voluntariness of his statement. He took with him to the DEA office a bloodstained jacket which he had kept more than one and one-half years since his alleged kidnapping. He took this action in response to nothing more than a telephone invitation from Agent Mattiase asking him if he would come and meet with the agents concerning Robert Wyler. The Court concludes that taking the jacket to the interview reflected Miles' intention to voluntarily report the alleged crime which caused the staining.

Therefore, the Court finds that Miles was not coerced, threatened with prosecution, or in any other way induced to cooperate or reveal information regarding the crimes charged in the indictment. The testimony of both Mattiase and Miles indicates that Miles himself voluntarily revealed the circumstances surrounding the alleged extortion which forms the basis of this indictment—alleged events wholly unknown to the agents until this revelation.

## THE TIME SPAN FROM SEARCH TO CONTACT WITH WITNESS TO TESTIMONY AT TRIAL

The "length of the road" from the unlawful search, to the initial contact with the

allegedly tainted witness, to his actual testimony at trial is yet another factor to be assessed in determining whether the events are sufficiently attenuated so as to purge the taint. *United States v. Ceccolini, supra,* 435 U.S. at 279, 98 S.Ct. at 1061; *United States v. Scios, supra,* at 960.

Here the road was not short. Six months elapsed from May 29, 31, 1978, when federal agents entered the Florida house and seized business records mentioning Miles, and November 29, 1978 when Miles was interviewed at DEA headquarters. Miles' association with and knowledge of Wyler and the alleged circumstances of the extortion now charged in the indictment preceded by at least two years the agents' contact with him. Moreover, Miles was first questioned by the federal agents on November 29, 1978; but, he did not actually testify until March of 1980 during the trial of Patrick Growich and Michael Sutter, alleged co-conspirators in this indictment. During this eighteen month period the Court finds that Miles had sufficient time for "detached recollection" and contemplation of his testimony. *United States v. Ceccolini, supra,* 435 U.S. at 277, 98 S.Ct. at 1060.

These lengthy time spans from search to contact to interview are sufficient to convince the Court that Miles' willingness to testify is the product of a persistent desire to cooperate rather than the "tainted fruit of an illegal search."

### THE PURPOSE OF THE SEARCH AND FUTURE DETERRENCE

■ Where the specific purpose of an alleged illegal search is to identify witnesses the exclusionary rule must be scrupulously applied. *United States v. Ceccolini, supra,* at 276 n.4, 98 S.Ct. at 1060 n.4. Agent Mattiase testified that the agents were initially conducting an investigation of the whereabouts of the fugitive Wyler and of his involvement in narcotics. Also underway was a RICO investigation to determine whether monies obtained from Wyler's drug trafficking had been used to finance legitimate businesses. The agent admits that the illegally seized evidence at the Florida house expanded and accelerated the RICO investigation. However, as previously indicated, at the time of the unlawful entry into the Florida house the agents had no knowledge of the alleged crimes involving Miles and were not investigating extortion or kidnapping charges against Robert Wyler. In the words of Agent Mattiase, "the search of the house in Florida was to find Robert Wyler"–who was then a much sought fugitive from a federal narcotics prosecution.

The Court finds that the government has demonstrated that the purpose of the search was not to find Miles, or information about Gulfport, or evidence about the crimes alleged in the indictment herein. Rather, the information discovered about these matters was a "by product" of the search. Thus, Miles is indeed a "found" witness. *United States v. Leonardi, supra,* at 752. *Cf., United States v. Scios, supra,* at 961.

The Supreme Court has long held that the exclusionary rule was designed to deter willful and flagrant police misconduct in violation of Fourth Amendment rights. *Weeks v. United States,* 232 U.S. 383, 34 S.Ct. 341, 58 L.Ed. 652 (1914). The rule is best applied when "its remedial objectives are thought most efficaciously served." *United States v. Calandra,* 414 U.S. 338, 348, 94 S.Ct. 613, 620, 38 L.Ed.2d 561, 571 (1974).

The record in this case establishes that the agents entered the house of Shawn Becker and Robert Wyler with the good faith belief, albeit mistaken, that the house was vacant (abandoned), and that William Schukter, the mortgage holder who authorized their entry, had the authority to do so. The Fifth Circuit has recently held that "evidence is not to be suppressed under the exclusionary rule where it is discovered by officers in the course of actions that are taken in good faith and in the reasonable, though mistaken, belief that they are authorized." *United States v. Williams,* 622 F.2d 830, 840 (5th Cir. 1980). The *Williams* Court reasoned that the exclusionary rule was designed to deter wilful or flagrant action by police and if the reasons for the

rule ceased, its application should cease also. Thus, they concluded, "[t]he costs to society of applying the rule beyond the purposes it exists to serve are simply too high . . . with few or no offsetting benefits." *Id.*

Thus far, this Circuit has not read a good faith exception into the exclusionary rule, hence, the documents and business records seized in the unlawful search of the Florida house herein were suppressed. With the suppression of this physical evidence the exclusionary rule has already had a limiting effect on the prosecution of this case and has been an "obstruction to the ascertainment of truth." *United States v. Ceccolini, supra,* 435 U.S. at 277, 98 S.Ct. at 1061.

However, *Ceccolini* cautions that "the exclusionary rule should be invoked with much greater reluctance where the claim is based on a causal relationship between a constitutional violation and the discovery of a live witness than when a similar claim is advanced to support suppression of an inanimate object." *Id.* at 280, 98 S.Ct. at 1062. Expressing concern that such exclusion would "perpetually disable a witness from testifying about relevant and material facts, regardless of how unrelated such testimony might be to the purpose of the originally illegal search," *id.* at 277, 98 S.Ct. at 1060, and relying on the earlier decisions of *Stone v. Powell,* 428 U.S. 465, 96 S.Ct. 3037, 49 L.Ed.2d 1067 (1976) and *United States v. Calandra,* 414 U.S. 338, 94 S.Ct. 613, 38 L.Ed.2d 561 (1974), *Ceccolini* instructs the Court to consider not only the benefits of protecting Fourth Amendment rights but the substantial costs the rule imposes. Thus, this Court must balance the cost to society of suppressing competent, voluntary, live testimony against the prospect of deterring unlawful law enforcement activity and incrementally enhancing Fourth Amendment values. In *Ceccolini* the Court found that "[t]he cost of permanently silencing Hennessy [the live witness] is too great for an evenhanded system of law enforcement to bear in order to secure such a speculative and very likely negligible deterrent effect.", *supra* 435 U.S. at 280, 98 S.Ct. at 1062.

As in *Ceccolini,* the Court finds that the rule would not be well-served by excluding the testimony of the live witness, Miles. The officers entered the Florida house in good faith and with the reasonable belief that they were authorized to do so. Under these circumstances, to suppress evidence of another crime which they inadvertently discovered much later would not, in the Court's view, deter such unlawful entries in the future. Moreover, the Court finds in the context of this case that the public interest is best served by "prosecuting those accused of crime and having them acquitted or convicted on the basis of all the evidence which exposes the truth." *Alderman v. United States,* 394 U.S. 165, 175, 89 S.Ct. 961, 967, 22 L.Ed.2d 176, 182 (1969).

■ Where, as here, documents "found" in a good faith warrantless search lead to the identity of a victim in a previously undiscovered crime, neither the purposes of the exclusionary rule nor the public interest would be benefitted by suppressing the evidence.

## CONCLUSION

Having considered the totality of the circumstances surrounding the discovery and the statements and testimony of the witness Miles, and considering the important purposes of the exclusionary rule, the Court finds that his testimony is sufficiently attenuated from the unlawful search to purge the taint of the illegality.

The motion to suppress Miles' statements and testimony is denied. This matter will proceed to trial on Monday, November 10, 1980, at 9:30 a. m.